# Illinois Official Reports

## Supreme Court

---

**People v. Eubanks, 2019 IL 123525**

---

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. RALPH EUBANKS, Appellee. |
| Docket No. | 123525 |
| Filed | December 5, 2019 |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Timothy Joyce, Judge, presiding. |
| Judgment | Appellate court judgment affirmed in part and reversed in part. Circuit court judgment affirmed in part and reversed in part. Cause remanded. |
| Counsel on Appeal | Kwame Raoul, Attorney General, of Springfield (David L. Franklin, Solicitor General, and Michael M. Glick and Leah M. Bendik, Assistant Attorneys General, of Chicago, of counsel), for the People. |
| | James E. Chadd, State Appellate Defender, Patricia Mysza, Deputy Defender, and Deepa Punjabi, Assistant Appellate Defender, of State Appellate Defender's Office, of Chicago, for appellee. |

Justices
JUSTICE THOMAS delivered the judgment of the court, with opinion.

Justices Kilbride, Garman, and Karmeier concurred in the judgment and opinion.

Chief Justice Burke specially concurred, with opinion.

Justice Theis concurred in part and dissented in part, with opinion.

Justice Neville took no part in the decision.

**OPINION**

¶ 1    Shortly before 9 p.m. on December 21, 2009, Maria Worthon was killed by a hit-and-run driver near the intersection of Greenview and Greenleaf Avenues in Chicago. Worthon's son, Jeremiah, was seriously injured in the accident. The State charged defendant, Ralph Eubanks, with numerous offenses arising out of the incident. A jury ultimately convicted defendant of first degree murder (720 ILCS 5/9-1(a)(2) (West 2008)), failure to report an accident involving death or injury (625 ILCS 5/11-401(b), (d) (West 2008)), and aggravated driving under the influence (DUI) (*id.* § 11-501(a)(6), (d)(1)(C), (d)(1)(F) (driving with any amount of a controlled substance in the person's blood, breath, or urine)). Defendant appealed, and the Appellate Court, First District, reversed defendant's aggravated DUI conviction, holding that section 11-501.2(c)(2) of the Illinois Vehicle Code (*id.* § 11-501.2(c)(2)) is facially unconstitutional because it permits compelled chemical testing without a warrant "in all cases where an officer has probable cause to believe that a driver under the influence has caused death or personal injury to another." 2017 IL App (1st) 142837, ¶ 66. The court also reversed defendant's conviction for first degree murder and remanded for a new trial, holding that the Cook County circuit court abused its discretion in denying defendant's request for a reckless homicide instruction. Finally, the court reduced the felony class of defendant's conviction of failure to report an accident. We allowed the State's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. July 1, 2018).

¶ 2                                    BACKGROUND
¶ 3              *Motions to Suppress and to Declare Statute Unconstitutional*
¶ 4    Prior to trial, defendant filed a motion to suppress the results of blood and urine testing that was done against his will. Defendant contended that he did not consent to chemical testing of his blood and urine, the police did not have a warrant for the testing, and no exigent circumstances were present that would have prevented the police from obtaining a warrant. Accordingly, defendant alleged that the testing amounted to an unconstitutional search. Defendant also moved to declare section 11-501.2(c)(2) of the Vehicle Code unconstitutional on its face and as applied to his case. At the relevant time, this statute provided as follows:

> "Notwithstanding any ability to refuse under this Code to submit to these tests or any ability to revoke the implied consent to these tests, if a law enforcement officer has probable cause to believe that a motor vehicle driven by or in actual physical control of a person under the influence of alcohol, other drug or drugs, or intoxicating

- 2 -

compound or compounds, or any combination thereof has caused the death or personal injury to another, that person shall submit, upon the request of a law enforcement officer, to a chemical test or tests of his or her blood, breath or urine for the purpose of determining the alcohol content thereof or the presence of any other drug or combination of both.

This provision does not affect the applicability of or imposition of driver's license sanctions under Section 11-501.1 of this Code."[1] 625 ILCS 5/11-501.2(c)(2) (West 2008).

Defendant contended that this section was unconstitutional under *Missouri v. McNeely*, 569 U.S. 141 (2013), as it allowed the police to obtain chemical testing in the absence of a case-specific determination of exigency.

¶ 5        At the hearing on defendant's motions, the parties stipulated to the following facts. On December 21, 2009, defendant was arrested in connection with a hit-and-run accident that resulted in the death of Maria Worthon and injuries to her son, Jeremiah. The police had probable cause for the arrest. Defendant was initially taken to district 24 but was eventually transferred to area 3 for processing and questioning. An officer informed him that he was being charged with DUI, read him the DUI motorist warnings, and asked defendant to take a breath test. Defendant refused. Defendant also refused to submit to blood and urine testing. An officer noted the time of the refusal at 12:05 a.m.

¶ 6        Defendant was left alone in the interview room until 1:37 a.m., when Officer Michael Deneen told him that he was going to take him to the hospital because he was required to give blood and urine samples. At 2:53 a.m., an officer took defendant to the hospital. At the hospital, defendant refused to comply with the blood test, and he was physically restrained by hospital security. His wrists were cuffed to separate rails of a hospital bed, and blood was forcibly taken from him at 4 a.m. A nurse then asked him to provide a urine sample, and defendant refused. The nurse threatened to take the urine with a catheter, and she ordered a catheter at 4:56 a.m. When the nurse approached defendant with the catheter, defendant agreed to provide a urine sample. Defendant provided the sample at 5:20 a.m.

¶ 7        The blood and urine samples were sent to the Illinois State Police crime lab for analysis. The blood tested negative for alcohol or any illegal substance. The urine tested positive for cannabis, ecstasy, and cocaine metabolite.

¶ 8        The trial court denied both motions. The court found that the statute was valid under *Schmerber v. California*, 384 U.S. 757 (1966), and *People v. Jones*, 214 Ill. 2d 187 (2005). In *Jones*, this court interpreted *Schmerber* as allowing compulsory blood testing when the police have probable cause to believe that a person has been driving while intoxicated. *Jones*, 214 Ill. 2d at 195-96. The court acknowledged the later authority of *McNeely* but found that *McNeely* had reasserted the validity of *Schmerber*. With respect to the motion to suppress, the court found that the totality of the circumstances presented a sufficient exigency that the police were

---

[1]The statute was later amended to add (1) the phrase "the law enforcement officer shall request, and" before the phrase "that person shall submit" and (2) "other bodily substance" to the list of things that may be tested. See Pub. Act 97-471, § 5 (eff. Aug. 22, 2011); Pub. Act 99-697, § 20 (eff. July 29, 2016); 625 ILCS 5/11-501.2(c)(2) (2018).

justified in taking the blood and urine without defendant's consent and without a warrant.

¶ 9                                                                    *Trial*

¶ 10          The following facts were developed at trial. Shortly before 9 p.m. on December 21, 2009, Chicago police officers Brian Murphy and Chris Wertepny were on routine patrol in the Rogers Park neighborhood when they saw a green Pontiac, with no headlights on, traveling at a high rate of speed. The officers activated their emergency lights and began following the vehicle. The officers could see two individuals in the vehicle. The car eventually stopped, and the officers approached it on foot. As the officers got to the car, the driver sped away and did not stop at any stop signs. The officers attempted unsuccessfully to follow the vehicle but were able to obtain its license plate number. Officer Murphy gave a description of the vehicle and its license plate number to dispatch.

¶ 11          Shortly after losing sight of the vehicle, the officers came across what appeared to be an accident involving two pedestrians near the intersection of Greenleaf and Greenview Avenues. Witnesses described the vehicle that had hit the pedestrians, and the information matched the description of the vehicle that had fled the traffic stop. Two of the witnesses that approached the officers were Calvin Tanner and Dennis Jeter. Tanner had blood on his face.

¶ 12          Shortly before 9 p.m. on that same evening, Felix Worthon went to meet his wife, Maria, at the bus stop. The Worthons' six-year-old son, Jeremiah, was with him. After Maria got off the bus, the three of them began walking home. As they passed a church near Greenleaf and Greenview Avenues, they saw a man whom they knew from church, Maurice Glover. Maria and Jeremiah stopped to talk to Glover, and Felix crossed Greenview Avenue. Felix thought that he heard something and went back to Greenview to see what it was. As he crossed the street, he was almost hit by a car with no headlights on. Felix then saw the vehicle strike his wife and son. The car did not appear to apply the brakes at all and kept going after it struck Maria and Jeremiah. Felix got to Jeremiah first and found him bleeding from the back of the head and spitting up blood. Felix eventually found his wife almost a block from where he found Jeremiah. The top of Maria's head was gone. Felix described her face as "unrecognizable" and testified that blood was coming "from everywhere." After an ambulance arrived, Felix heard a paramedic tell the police that Maria was gone. Jeremiah suffered permanent injuries.

¶ 13          Maurice Glover witnessed the accident. He saw Maria and Jeremiah cross the street between two parked cars, and he also saw a dark car without its headlights on coming down the street. He estimated that the car was going 80 to 90 miles per hour. He heard a scream and a boom. He saw Maria's body come down out of the air, and gray matter and parts of her brain landed on the street. The car that hit her never stopped.

¶ 14          Madeline Moratto and Alex Montejo also witnessed the accident. They were walking down Greenview Avenue on the sidewalk. Moratto described the area as a quiet residential neighborhood, and she said there were a few other people out walking at the time. After they passed the Worthon family on the sidewalk, they heard the sound of a car's engine revving and tires squealing. They heard the sound of a loud impact and then saw a woman flipping head over heels in the air. Moratto estimated that the woman was thrown 30 feet in the air. The woman's body landed approximately 100 feet from where it was hit. Moratto saw a dark sedan with its headlights off keep driving past the body at about 80 miles per hour. The car did not stop at the stop sign at the intersection of Greenview and Greenleaf. Montejo described seeing

a woman smashed up against the passenger side of a car's windshield before she was thrown through the air. The car's headlights were off, and it never slowed down or stopped. The woman's body was thrown high enough that it went through the tree branches. Montejo estimated the car's speed at about 60 to 70 miles per hour.

¶ 15 Officers Jennifer Escher, Scott Pierson, and Patrick McHugh were on patrol when they received a radio call about a hit-and-run accident involving a green Pontiac. Escher saw the Pontiac in an alleyway and approached it at 50 miles per hour. The Pontiac sped away, and Escher lost sight of it. The three officers all saw the Pontiac on Newgard Avenue. Pierson drove his squad car in front of the Pontiac. Pierson approached the car on foot, following which the Pontiac went into reverse, lost control, and started "ping-ponging" off parked cars. Defendant jumped out of the Pontiac and attempted to flee on foot, but he was apprehended by Officer John Ventrella and taken into custody at 9:05 p.m.

¶ 16 Calvin Tanner testified that he was the passenger in the car with defendant when the collision occurred. Defendant is friends with Tanner and Tanner's cousin, Dennis Jeter. On December 21, 2009, defendant drove Calvin in Dennis's 1998 green Pontiac to the home of Tanner's grandmother, where they met Dennis. Calvin and Dennis drank alcohol at the house but claimed not to have seen whether defendant was drinking. Jeter testified that he assumed that defendant was drinking.

¶ 17 Later that night, defendant borrowed Jeter's car and took Tanner to pick up a futon on the north side, near Tanner's new apartment. When they approached Jonquil Terrace and Greenview Avenue, defendant pulled over because they heard an ambulance. He continued driving, and as he approached Greenview and Greenleaf Avenues, there was a U-Haul in front of a church. Defendant hit something, and Tanner told him, "I hope you didn't do what I thought you did." Tanner hoped it was a parked car that defendant hit but feared that it was a person. The collision caused the front windshield to shatter, and Tanner had glass and blood in his mouth. Tanner testified that defendant had been driving fast and that he had told defendant to slow down. At trial, he claimed that the fast driving occurred on the expressway. But in his statement to a prosecutor and in his grand jury testimony, Tanner stated that defendant had been driving fast in a residential area. Tanner testified before the grand jury that defendant was driving around 50 to 60 miles per hour. Tanner denied that he told the police that there was no obstruction in the area and insisted that he had mentioned a parked U-Haul. Tanner had said in his statement to the prosecutor that defendant was driving at a high rate of speed, and Tanner was afraid he was going to get hurt. He said that when he told defendant that he hoped he didn't hit what he thought he hit, defendant replied, "It's too late." At trial, Tanner acknowledged that he was allowed to review his statement to the prosecutor but said that he did not know how to read or write and that the police had pressured him to cooperate.

¶ 18 After the collision, Tanner got defendant to stop the car and let him out. Tanner asked defendant to go back to the scene of the accident with him, but defendant refused. Defendant drove away without him. Tanner called Jeter and told him that his car had been wrecked. Jeter testified that, when Tanner called him to tell him that defendant had had an accident in Jeter's car, Tanner sounded hyper, scared, and startled. Jeter met up with Tanner, and Tanner had glass and blood on his face. Tanner and Jeter went to the scene of the accident and saw that someone had been hit. Tanner told the police that he had been a passenger in the car.

¶ 19    Officer Ventrella took defendant to the police station. At midnight, Ventrella found defendant asleep in the interview room. Ventrella woke him up, and defendant refused to take a breath test or to provide blood or urine samples. At 2:57 a.m.,[2] Ventrella and a fellow officer took defendant to Louis A. Weiss Memorial Hospital to have his blood and urine tested. A nurse attempted to draw blood from defendant, and he became combative and refused to comply with the test. Before that, defendant had been carefree and was making jokes, and Ventrella noticed an odor of alcohol emanating from him. Ventrella testified that defendant seemed unaffected by the whole incident. Because defendant refused to comply with the test, Ventrella told him that they would have to hold him down. Additional security officers came into defendant's room, and he was handcuffed to the bed. The officers held defendant's arm down, and the nurse drew blood at 4:10 a.m. Defendant also refused to provide a urine sample, and the nurse told him he would be catheterized if he did not comply. Defendant finally gave the sample at 5:20 a.m. Defendant was then taken back to the interview room at the police station. Defendant told Ventrella that he needed to use the restroom and explained that he had been drinking a fifth of Hennessy earlier.

¶ 20    Defendant's blood tested negative for drugs or alcohol. His urine, however, tested positive for cannabis and its metabolite, ecstasy and its metabolite, and cocaine metabolite. A forensic toxicologist testified that the body converts drugs to metabolites as part of the metabolic process.

¶ 21    Defendant testified on his own behalf. Defendant denied being the driver on the night of the crash. According to defendant, Jeter had called him and asked him to return his car so that Jeter and Tanner could go get a futon. Defendant dropped off the car at Jeter's grandmother's house and then hung out there with Jeter and Tanner. Defendant drank from a pint of Hennessy that he brought with him. Defendant testified that Jeter and Tanner asked him to hold Jeter's parking spot while they went to pick up the futon. While he was standing in the parking spot, he received a call from Tanner, who said he had just been in an accident. Defendant asked where Tanner was and began walking in that direction. When defendant saw the police, he ran because he was carrying cannabis. The police chased and arrested him. On cross-examination, defendant admitted to drinking a quart of Hennessy earlier in the day. He denied smoking marijuana on the day in question. He said they had planned to smoke some later, after Jeter and Tanner had picked up the futon. Defendant said that he had not smoked marijuana for "probably a week almost." Defendant said that he had taken ecstasy two days before the incident. He denied using cocaine and explained that the cocaine that showed up in his system must have been mixed in with the ecstasy.

¶ 22    Defendant asked that the jury be instructed on reckless homicide, which defendant contended was the appropriate charge in this case. Focusing primarily on the speed of the vehicle and the severity of the impact with Maria Worthon and that the accident took place in a highly populated area, the trial court denied the instruction. The court explained that there was not sufficient evidence of recklessness and that "[i]t's an issue of first degree murder or not guilty."

---

[2]In the stipulation of facts, the time was listed as 2:53 a.m.

¶ 23    The jury convicted defendant of first degree murder, aggravated DUI, and failure to report a motor vehicle accident involving death or injury. The trial court sentenced defendant to consecutive prison terms of 30, 6, and 4 years, respectively.

¶ 24    Defendant appealed, raising four issues: (1) he was entitled to a new trial on first degree murder because the trial court erred in refusing to instruct the jury on reckless homicide, (2) the State failed to prove beyond a reasonable doubt that he failed to report the accident at a police station within half an hour, (3) his aggravated DUI conviction had to be reversed because the warrantless nonconsensual testing of his blood and urine was an unconstitutional search, and (4) he was denied a fair trial by the prosecutor's repeated misstatements of fact and attempts to inflame the jurors' emotions.

¶ 25    The appellate court agreed with defendant that the trial court should have instructed the jury on reckless homicide. The court explained that the primary distinction between reckless homicide and first degree murder is the defendant's mental state and noted that this court had held in *People v. DiVincenzo*, 183 Ill. 2d 239, 253 (1998), that "inferences as to [a] defendant's mental state are a matter particularly within the province of the jury." (Internal quotation marks omitted.) 2017 IL App (1st) 142837, ¶ 34. The court relied heavily on this court's decision in *People v. Belk*, 203 Ill. 2d 187 (2003), in which the defendant drove under the influence of alcohol at over 100 miles per hour through an area with many restaurants and other establishments open for business. The defendant crashed into another vehicle and killed both of its occupants. *Id.* at 190. This court reduced the defendant's felony murder conviction to reckless homicide because the defendant's act of stealing the van was not a "forcible felony." *Id.* at 195-96. This court held that evidence that the intoxicated defendant drove at an excessive rate of speed through an area where he was likely to encounter pedestrians or other vehicles supported an inference that the defendant "acted recklessly and contemplated that in attempting to elude police he was likely to cause death or great bodily harm." *Id.* at 195. This court explained that such an inference clearly supported a reckless homicide conviction. *Id.* Here, the appellate court found the present case sufficiently similar to *Belk* that, if such an inference supported a reckless homicide conviction there, it would also support one here. 2017 IL App (1st) 142837, ¶ 37. Accordingly, the court reversed defendant's first degree murder conviction and remanded for a new trial. *Id.* ¶ 41.

¶ 26    Next, the appellate court considered defendant's argument that his conviction for failure to report the accident within 30 minutes had to be reversed. It is a Class 1 felony for a driver to flee the scene of a motor vehicle accident resulting in death and fail to report the accident at a police station or sheriff's office within half an hour. See 625 ILCS 5/11-401(b), (d) (West 2008). The court noted, however, that defendant was arrested and taken into police custody less than 10 minutes after the accident occurred. Because a defendant's postarrest silence is not admissible in the State's case-in-chief (see *People v. Simmons*, 293 Ill. App. 3d 806, 811 (1998)), the court held that the State could not establish that defendant failed to report the accident within half an hour. The court thus reduced defendant's conviction from the Class 1 version of the offense to the Class 4 version, which provides that a driver must stop at the scene of the accident and remain there until the requirements of section 11-403 of the Vehicle Code

have been fulfilled[3] (see 625 ILCS 5/11-401(a), (c) (West 2008)). 2017 IL App (1st) 142837, ¶ 49.

¶ 27    Finally, the court agreed with defendant that section 11-501.2(c)(2) is facially unconstitutional under *McNeely*. The court explained that the United States Supreme Court in *McNeely* had declined to adopt an approach that a *per se* exigency exists in every DUI case because of the dissipation of alcohol in the blood. *Id.* ¶ 59. Rather, the Supreme Court held that exigency must be determined under a totality-of-the-circumstances approach on a case-by-case basis. *Id.* The appellate court thus held that section 11-501.2(c)(2) is unconstitutional on its face because it allows compelled chemical testing without a warrant in every case in which a person drives under the influence and causes injury or death. *Id.* ¶ 66. The court further noted that the State had not demonstrated exigent circumstances, as defendant was taken into custody at 9:05 p.m. and told he was under arrest at 12 a.m. but not taken to the hospital for testing until 2:57 a.m. The court stated that "[n]othing in the record indicates that Ventrella or another officer could not have obtained a warrant in that three-hour period." *Id.* ¶ 67. Accordingly, the court reversed defendant's aggravated DUI conviction outright, as the State conceded that there was insufficient evidence to sustain the conviction without it. *Id.* ¶ 74. The court further ordered that the evidence be excluded at defendant's new trial on first degree murder charges. *Id.* Because of the way it resolved these three issues, the court declined to address defendant's arguments about prosecutorial misconduct. *Id.* ¶ 77.

¶ 28    Justice Pucinski dissented. The dissent contended that defendant was not entitled to a new trial on first degree murder. According to the dissent, defendant's denial that he was involved in the accident precluded him from obtaining a lesser included offense instruction. *Id.* ¶ 81 (Pucinski, J., dissenting). Because defendant claimed that he was not the driver of the car, the dissent argued that he could not request a reckless homicide instruction. *Id.* ¶ 82. Next, the dissent disagreed with the majority's decision to reduce the class of defendant's failure-to-report conviction. The dissent noted that defendant had not made a self-incrimination argument and contended that the majority erred in making such an argument for him. *Id.* ¶ 109. Defendant had argued that the State did not prove that he failed to make a timely report, and the dissent explained that the jury could have easily inferred that defendant made no such report, as defendant had consistently denied even being at the scene of the accident. *Id.* ¶¶ 110-11. On the blood draw issue, the dissent would have found that defendant was subjected to an unconstitutional search because the police had ample opportunity to obtain a warrant but had not done so. *Id.* ¶ 120. The dissent argued,

> "There are about 400 judges in Cook County. The State's Attorney's felony review unit operates 24 hours per day, seven days per week. It is simply not credible that the police could not find some way to find a judge to hear the question of the warrant between 9:05 p.m., when defendant was arrested, and 4:10 a.m., when the blood was drawn with force, and 5:20 a.m., when the urine sample was collected under pressure." *Id.*

---

[3]Section 11-403 requires a driver involved in an accident that causes injury or death to render aid to anyone injured in the accident and to give certain information such as his name, address, registration number, and the name of the vehicle's owner. See 625 ILCS 5/11-403 (West 2008).

The dissent believed that it was unnecessary to decide whether section 11-501.2(c)(2) is unconstitutional. *Id.* ¶ 119.

¶ 29                                   ANALYSIS
¶ 30                   I. Constitutionality of Blood and Urine Testing
¶ 31        The State originally made two arguments with respect to the appellate court's suppression of the blood and urine test results. First, citing the principle of constitutional avoidance, the State contended that the appellate court majority erred in addressing the constitutionality of section 11-501.2(c)(2). Because the court found that the warrantless search of defendant was unconstitutional under *McNeely* in that it was conducted without defendant's consent and in the absence of exigent circumstances, the State argued that the court should have ended its analysis there without addressing the facial constitutionality of the statute.[4] Second, the State argued that, if this court does address the constitutionality of section 11-501.2(c)(2), it should find it unconstitutional as applied to defendant instead of facially unconstitutional. The State argued that the statute is not invalid in all its applications and, therefore, it is not facially unconstitutional. According to the State, the statute could be validly applied in three situations: when the police have a warrant, when the defendant consented to the chemical testing, or when exigent circumstances are present.

¶ 32        Following oral argument, this court ordered the parties to file supplemental briefs addressing the relevance of two United States Supreme Court opinions: *Mitchell v. Wisconsin*, 588 U.S. ___, 139 S. Ct. 2525 (2019) (plurality opinion) (the most recent United States Supreme Court case involving the constitutionality of warrantless blood draws in DUI cases), and *City of Los Angeles v. Patel*, 576 U.S. ___, 135 S. Ct. 2443 (2015) (giving guidance on how to analyze facial challenges under the fourth amendment). In its supplemental brief, the State withdraws its concession that defendant's fourth amendment rights were violated. Based on the reasoning in *Mitchell*, the State contends that the testing of defendant's blood and urine was valid under the exigent circumstances exception to the warrant requirement. The State now argues that this court should address the constitutionality of section 11-501.2(c)(2) and find it facially valid. The State withdraws its argument that the statute can be validly applied when the police have a warrant but maintains its argument that section 11-501.2(c)(2) is validly applied when the defendant consents to the search or when exigent circumstances are present.

¶ 33        When reviewing the trial court's ruling on a motion to suppress evidence, we ordinarily apply a two-part standard of review. *People v. Grant*, 2013 IL 112734, ¶ 12. We will reverse the trial court's factual findings only if they are against the manifest weight of the evidence, but we review *de novo* the trial court's ultimate ruling on whether the evidence should be suppressed. *Id.* Here, the trial court was not required to engage in fact finding or to make credibility determinations because the parties elected to proceed by way of stipulated facts. Thus, we need only consider the trial court's application of the law to undisputed facts. Accordingly, *de novo* review is appropriate. See *People v. Ceja*, 204 Ill. 2d 332, 347 (2003); see also *People v. Coats*, 269 Ill. App. 3d 1008, 1012 (1995) (*de novo* review is appropriate when parties proceeded by way of stipulated facts at hearing on motion to suppress).

---

[4]The State originally did not dispute that the search was conducted in violation of defendant's fourth amendment rights.

¶ 34    The constitutionality of a statute is also a question that we review *de novo*. *People v. Madrigal*, 241 Ill. 2d 463, 466 (2011). A party bringing a facial challenge to a statute faces a particularly heavy burden. *People v. Rizzo*, 2016 IL 118599, ¶ 24. Demonstrating that the statute could be found unconstitutional under some set of circumstances does not establish its facial unconstitutionality. *Oswald v. Hamer*, 2018 IL 122203, ¶ 40. Rather, a statute will be found facially unconstitutional only if there is no set of circumstances under which the statute would be valid. *People v. Gray*, 2017 IL 120958, ¶ 58. If it is reasonably possible to construe the statute in a manner that preserves its constitutionality, we have a duty to do so. *People v. Hollins*, 2012 IL 112754, ¶ 13.

¶ 35                                    A. *McNeely*

¶ 36    The appellate court's facial invalidation of section 11-501.2(c)(2) was based on *McNeely*, 569 U.S. 141. In *McNeely*, the Supreme Court resolved a conflict over how to interpret *Schmerber*, 384 U.S. 757. In *Schmerber*, the defendant was taken to the hospital to receive treatment for injuries he suffered during a traffic accident. *Id.* at 758. While at the hospital, he was arrested for driving under the influence of alcohol. *Id.* On the advice of counsel, the defendant refused to submit to a blood test. *Id.* at 759. A police officer then ordered a physician to withdraw a blood sample. *Id.* at 758. At trial, the defendant objected to the admission of the test results on several grounds, including that he had been subjected to an unlawful search in violation of the fourth amendment. *Id.* at 759.

¶ 37    The Supreme Court acknowledged that the withdrawal of the defendant's blood in these circumstances constituted a search under the fourth amendment. *Id.* at 767. The Court noted that the police had probable cause for the arrest and the same facts that established probable cause suggested the relevance and likely success of a blood alcohol test. *Id.* at 770. However, in the absence of an emergency, a warrant was required before the police could draw defendant's blood. *Id.* The Court then explained that the police were facing such an emergency:

> "The officer in the present case, however, might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened 'the destruction of evidence,' *Preston v. United States*, 376 U. S. 364, 367. We are told that the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system. Particularly in a case such as this, where time had to be taken to bring the accused to a hospital and to investigate the scene of the accident, there was no time to seek out a magistrate and secure a warrant. Given these special facts, we conclude that the attempt to secure evidence of blood-alcohol content in this case was an appropriate incident to petitioner's arrest." *Id.* at 770-71.

¶ 38    A conflict then developed in the courts over whether *Schmerber* stood for the proposition that the dissipation of alcohol in the blood was a *per se* exigency that allowed the police to take a blood sample in every case in which they had probable cause to suspect someone of driving under the influence of alcohol. This court implicitly read *Schmerber* as approving a *per se* exigency. In *People v. Todd*, 59 Ill. 2d 534, 544 (1975), this court stated that,

> "[s]ince *Schmerber v. California*, [384 U.S. 757 (1966),] it is clear that a compulsory blood test does not violate any constitutional rights of an individual merely because he

- 10 -

objected to such tests. Further, the absence of a formal arrest may not taint a limited search, given probable cause and evidence that may dissipate."

In *Jones*, this court described *Schmerber*'s holding as follows:

"[T]he taking of a blood sample without the defendant's consent or a search warrant was a 'reasonable' search under the fourth amendment where there was probable cause to believe the defendant was intoxicated, and the delay caused by obtaining a search warrant might have resulted in loss of evidence of the defendant's intoxication, given the natural dissipation of the alcohol in the defendant's blood." *Jones*, 214 Ill. 2d at 195.

Other states held that *Schmerber* did not stand for the proposition that the natural dissipation of alcohol in the blood was a *per se* exigency. These courts held that the finding of exigency in *Schmerber* was based on the specific facts in that case and that the dissipation of alcohol in the blood was only one of several factors supporting the determination of exigency. See, *e.g.*, *State v. Johnson*, 744 N.W.2d 340, 344 (Iowa 2008); *State v. Rodriguez*, 2007 UT 15, ¶¶ 30-31, 156 P.3d 771.

¶ 39 In *McNeely*, the Supreme Court endorsed the latter interpretation. In that case, the defendant was stopped after a police officer observed him speeding and repeatedly crossing the centerline. *McNeely*, 569 U.S. at 145. The officer observed signs of intoxication, and the defendant admitted that he had been drinking. *Id.* After performing poorly on field sobriety tests, the defendant refused to submit to a breath test. *Id.* The officer arrested the defendant and began to transport him to the police station. *Id.* However, when the defendant stated that he would still refuse to give a breath test at the station, the officer changed course and took the defendant to the hospital for blood testing. *Id.* at 145-46. At the hospital, the defendant refused to consent to the blood sample, and the officer ordered a lab technician to take it anyway. *Id.* at 146. The sample was drawn approximately half an hour after the defendant had been stopped for the traffic violation. *Id.* The officer had not attempted to get a warrant. *Id.*

¶ 40 The defendant was charged with driving while intoxicated, and he moved to suppress the results of the blood test. *Id.* The trial court agreed with the defendant that his fourth amendment rights had been violated because the warrantless search was not supported by exigent circumstances. *Id.* The Missouri Supreme Court affirmed, holding that *Schmerber* " 'requires more than the mere dissipation of blood-alcohol evidence to support a warrantless blood draw in an alcohol-related case.' " *Id.* at 147 (quoting *State v. McNeely*, 358 S.W.3d 65, 74 (Mo. 2012)).

¶ 41 The Supreme Court affirmed the Missouri Supreme Court's decision, holding that, "in drunk-driving investigations, the natural dissipation of alcohol in the bloodstream does not constitute an exigency in every case sufficient to justify conducting a blood test without a warrant." *McNeely*, 569 U.S. at 165. The Court explained that, when determining whether exigent circumstances exist to justify dispensing with a warrant, courts must examine the totality of the circumstances. *Id.* at 149-50. The Court explained that it had not dispensed with the totality-of-the-circumstances approach in *Schmerber*. *Id.* at 150-51. Rather, *Schmerber*'s holding was based on the "special facts" before the Court, and the determination of exigency was based on other factors in addition to the dissipation of alcohol in the blood, such as the fact that time had to be taken to bring the accused to the hospital and to investigate the scene of an accident. *Id.* at 151.

¶ 42 After dispensing with the argument that *Schmerber* had created a *per se* rule that exigent circumstances exist whenever a person is suspected of driving under the influence, the Court declined the State of Missouri's request that they adopt such a rule in the case before it. Rather, the Court held that, "[i]n those drunk-driving investigations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so." *Id.* at 152. The Court noted that there will usually be some delay before testing may be done because of the need to transport the defendant to a medical facility for testing. Accordingly, there will be situations where the warrant process will not delay testing because one officer can attempt to obtain a warrant while another is transporting the defendant to the medical facility. *Id.* at 153. The Court further explained that the State's proposed *per se* rule failed to take into account how streamlined the warrant process had become in the 47 years since *Schmerber* was decided, both because of standard-form warrant applications for drunk-driving investigations and technological advances allowing remote requests for warrants. *Id.* at 154-55. Three years later in *Birchfield v. North Dakota*, 579 U.S. ___, ___, 136 S. Ct. 2160, 2180 (2016), the Supreme Court reiterated that the exigent circumstances exception to the warrant requirement "always requires case-by-case determinations."

¶ 43 Defendant argued in the appellate court that section 11-501.2(c)(2) was unconstitutional both facially and as applied. The appellate court acknowledged this (2017 IL App (1st) 142837, ¶ 51) but addressed only the facial challenge. In its original brief to this court, the State acknowledged that the statute contained an impermissible *per se* exigency. However, the State argued that the appellate court had erred in holding that it was unconstitutional on its face. The State contended that the statute was not invalid in all its applications but rather could be validly applied in three circumstances: when the police have a warrant, when the defendant consents to the blood draw, and when exigent circumstances are present. Thus, the State asked that we find the statute unconstitutional only as applied to this defendant.

¶ 44 B. *Patel*

¶ 45 Neither the State nor defendant addressed *City of Los Angeles v. Patel*, 576 U.S. ___, 135 S. Ct. 2443, in their original briefs. In *Patel*, the Supreme Court gave guidance on how to analyze facial challenges under the fourth amendment. *Patel* involved a facial challenge to a Los Angeles Municipal Code provision that required hotel operators to allow the police to search their guest registers. Pursuant to a different provision of the code, Los Angeles requires hotel operators to record certain information about their guests. *Id.* at ___, 135 S. Ct. at 2447-48. The Los Angeles Municipal Code section at issue—section 41.49(3)(a)—required that these guest records " 'be made available to any officer of the Los Angeles Police Department for inspection.' " *Id.* at ___, 135 S. Ct. at 2448 (quoting Los Angeles Municipal Code § 41.49(3)(a) (eff. Mar. 8, 2008)). The section further provided that, " '[w]henever possible, the inspection shall be conducted at a time and in a manner that minimizes any interference with the operation of the business.' " *Id.* at ___, 135 S. Ct. at 2448 (quoting Los Angeles Municipal Code § 41.49(3)(a) (eff. Mar. 8, 2008)). No showing of probable cause was required before police could ask to search the records. Failure to comply with such a request would be a misdemeanor punishable by up to six months in jail and a $1000 fine. *Id.* at ___, 135 S. Ct. at 2448. A group of motel operators and a lodging association sought declaratory and injunctive relief, arguing that section 41.49(3)(a) was facially unconstitutional under the fourth

amendment. *Id.* at ___, 135 S. Ct. at 2448. The city prevailed in the trial court and in the Ninth Circuit. *Patel v. City of Los Angeles*, 686 F.3d 1085 (9th Cir. 2012). However, after the Ninth Circuit reheard the case *en banc*, it held the statute facially unconstitutional. *Patel*, 576 U.S. at ___, 135 S. Ct. at 2448; see *Patel v. City of Los Angeles*, 738 F.3d 1058 (9th Cir. 2013) (*en banc*).

¶ 46 The Supreme Court granted *certiorari* to answer two questions: (1) whether facial challenges may be brought under the fourth amendment and, if so, (2) whether section 41.49(3)(a) is facially unconstitutional. *Id.* at ___, 135 S. Ct. at 2447. The Court answered both questions in the affirmative. The Court first explained that "facial challenges under the Fourth Amendment are not categorically barred or especially disfavored." *Id.* at ___, 135 S. Ct. at 2449. The Court explained that, following its decision in *Sibron v. New York*, 392 U.S. 40 (1968), some courts had concluded that facial challenges may not be brought under the fourth amendment, based on *Sibron*'s statement that " '[t]he constitutional validity of a warrantless search is pre-eminently the sort of question which can only be decided in the concrete factual context of the individual case.' " *Patel*, 576 U.S. at ___, 135 S. Ct. at 2449 (quoting *Sibron*, 392 U.S. at 59). The *Patel* Court rejected this reading of *Sibron* and listed several cases in which it had entertained facial challenges under the fourth amendment to statutes authorizing warrantless searches. *Id.* at ___, 135 S. Ct. at 2450. The Court further noted several instances in which it had declared statutes facially invalid under the fourth amendment. *Id.* at ___, 135 S. Ct. at 2450.

¶ 47 The Court then addressed the City's argument that statutes authorizing warrantless searches will never satisfy the requirement for a successful facial challenge that the law must be invalid in all its applications. The City pointed to situations in which the police have a warrant, when the subject of the search consents to the search, and when the police are responding to an emergency. *Id.* at ___, 135 S. Ct. at 2450-51. The Court noted that acceptance of the City's argument would necessarily preclude facial invalidation under the fourth amendment of every statute authorizing warrantless searches. The City's argument thus could not be correct, as the Court's precedents showed that facial challenges to statutes authorizing warrantless searches have succeeded. *Id.* at ___, 135 S. Ct. at 2451.

¶ 48 The Court then explained that the City had misunderstood what it meant for a law to be unconstitutional in all its applications. The Court said that, "when assessing whether a statute meets the standard, the Court has considered only applications of the statute in which it actually authorizes or prohibits conduct" (*id.* at ___, 135 S. Ct. at 2451) and that the proper focus is on " 'the group for whom the law is a restriction, not the group for whom the law is irrelevant' " (*id.* at ___, 135 S. Ct. at 2451 (quoting *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 894 (1992))). The Court then explained that the examples that the City had given would not involve applications of the statute:

> "Similarly, when addressing a facial challenge to a statute authorizing warrantless searches, the proper focus of the constitutional inquiry is searches that the law actually authorizes, not those for which it is irrelevant. If exigency or a warrant justifies an officer's search, the subject of the search must permit it to proceed irrespective of whether it is authorized by statute. Statutes authorizing warrantless searches also do no work where the subject of a search has consented. Accordingly, the constitutional 'applications' that petitioner claims prevent facial relief here are irrelevant to our

- 13 -

analysis because they do not involve actual applications of the statute." *Id.* at ___, 135 S. Ct. at 2451.

The Court ultimately held the statute facially unconstitutional because it did not afford hotel operators an opportunity for precompliance review. *Id.* at ___, 135 S. Ct. at 2451. The Court had previously explained that, "absent consent, exigent circumstances, or the like, in order for an administrative search to be constitutional, the subject of the search must be afforded an opportunity to obtain precompliance review before a neutral decisionmaker." *Id.* at ___, 135 S. Ct. at 2452.

¶ 49                                    C. *Mitchell*

¶ 50        While the present case was pending before us, the Supreme Court decided *Mitchell v. Wisconsin*, 588 U.S. ___, 139 S. Ct. 2525. The question in *Mitchell* was whether the police could conduct a warrantless blood test of an unconscious DUI suspect. In *Birchfield*, the Supreme Court had held that a warrantless breath test could be administered as a search incident to an arrest of a DUI suspect but a warrantless blood test could not. *Birchfield*, 579 U.S. at ___, 136 S. Ct. at 2185. The difference is that breath tests "do not 'implicat[e] significant privacy concerns' " (*id.* at ___, 136 S. Ct. at 2176 (quoting *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 626 (1989))), while blood tests are considered " 'significant bodily intrusions' " (*id.* at ___, 136 S. Ct. at 2178 (quoting *McNeely*, 569 U.S. at 174 (Roberts, C.J., concurring in part and dissenting in part, joined by Breyer and Alito, JJ.))).

¶ 51        *Mitchell* presented the problem of a driver suspected of DUI who could not be administered a breath test because he was unconscious. Wisconsin has a statute that permits the testing of unconscious DUI suspects on the basis that they have not withdrawn statutory implied consent. The statute provides that a " 'person who is unconscious or otherwise not capable of withdrawing consent is presumed not to have' withdrawn it." *Mitchell*, 588 U.S. at ___, 139 S. Ct. at 2532 (quoting Wis. Stat. § 343.305(3)(b) (2013-14)). The Court noted that more than half the states have similar statutes.[5] *Id.* at ___, 139 S. Ct. at 2532. In the state courts, Wisconsin argued that compliance with the implied-consent law rendered the blood test consensual and thus valid under the fourth amendment. *Id.* at ___, 139 S. Ct. at 2532. The Supreme Court granted *certiorari* to decide " '[w]hether a statute authorizing a blood draw from an unconscious motorist provides an exception to the Fourth Amendment warrant requirement.' " *Id.* at ___, 139 S. Ct. at 2532.

¶ 52        The Supreme Court declined to resolve the case on the basis that the driver had consented to the blood draw. The Court explained:

> " 'Our prior opinions have referred approvingly to the general concept of implied-consent laws that impose civil penalties and evidentiary consequences on motorists who refuse to comply.' *Birchfield*, 579 U.S., at —— (slip op., at 36). But our decisions have not rested on the idea that these laws do what their popular name might seem to

---

[5]Illinois is one of these states. See 625 ILCS 5/11-501.1(b) (West 2008) ("Any person who is dead, unconscious, or who is otherwise in a condition rendering the person incapable of refusal, shall be deemed not to have withdrawn the consent provided by paragraph (a) of this Section and the test or tests may be administered, subject to the provisions of Section 11-501.2.").

- 14 -

suggest—that is, create actual consent to all the searches they authorize." *Id.* at ___, 139 S. Ct. at 2532-33.

Instead, the Court resolved the case on the basis of exigent circumstances. The Court did so even though Wisconsin had not argued at any level that exigent circumstances were present and indeed had affirmatively conceded that it was not relying on exigent circumstances. *Id.* at ___, 139 S. Ct. at 2545 (Sotomayor, J., dissenting, joined by Ginsburg and Kagan, JJ.).

¶ 53        The Court first explained that there is a compelling need for a blood test of drunk-driving suspects when the driver's condition renders a breath test impossible. *Id.* at ___, 139 S. Ct. at 2537. The Court then stated that most cases involving an unconscious driver will be controlled by *Schmerber*. *Id.* at ___, 139 S. Ct. at 2537. The Court read *Schmerber* as standing for the proposition that

> "exigency exists when (1) [blood alcohol content (BAC)] evidence is dissipating and (2) some other factor creates pressing health, safety, or law enforcement needs that would take priority over a warrant application." *Id.* at ___, 139 S. Ct. at 2537.

The Court explained that both factors will be present when the police are faced with an unconscious DUI suspect. *Id.* at ___, 139 S. Ct. at 2537.

¶ 54        The Court explained how *Schmerber*'s test for exigency applied to a situation involving an unconscious DUI suspect:

> "In *Schmerber*, the extra factor giving rise to urgent needs that would only add to the delay caused by a warrant application was a car accident; here it is the driver's unconsciousness. Indeed, unconsciousness does not just create pressing needs; it is itself a medical emergency. It means that the suspect will have to be rushed to the hospital or similar facility not just for the blood test itself but for urgent medical care. Police can reasonably anticipate that such a driver might require monitoring, positioning, and support on the way to the hospital; that his blood may be drawn anyway, for diagnostic purposes, immediately on arrival; and that immediate medical treatment could delay (or otherwise distort the results of) a blood draw conducted later, upon receipt of a warrant, thus reducing its evidentiary value. [Citation.] All of that sets this case apart from the uncomplicated drunk-driving scenarios addressed in *McNeely*. Just as the ramifications of a car accident pushed *Schmerber* over the line into exigency, so does the condition of an unconscious driver bring his blood draw under the exception. In such a case, as in *Schmerber*, an officer could 'reasonably have believed that he was confronted with an emergency.' 384 U. S., at 770." (Emphasis omitted.) *Id.* at ___, 139 S. Ct. at 2537-38.

The Court explained that an unconscious DUI suspect presents "just the kind of scenario for which the exigency rule was born." *Id.* at ___, 139 S. Ct. at 2538.

¶ 55        The Court was careful to note, however, that it was not departing from the totality-of-the-circumstances approach to determining exigent circumstances. The Court explained that, although a totality-of-the-circumstances approach must be used to determine exigency, the circumstances in drunk driving cases are often typical, and thus the Court may set forth "general rules" for the police to follow. *Id.* at ___, 139 S. Ct. at 2535 n.3. Accordingly, the Court stopped short of saying that exigent circumstances are *always* present when the police are faced with an unconscious drunk driving suspect:

"When police have probable cause to believe a person has committed a drunk-driving offense and the driver's unconsciousness or stupor requires him to be taken to the hospital or similar facility before police have a reasonable opportunity to administer a standard evidentiary breath test, they may *almost always* order a warrantless blood test to measure the driver's BAC without offending the Fourth Amendment. We do not rule out the possibility that in an unusual case a defendant would be able to show that his blood would not have been drawn if police had not been seeking BAC information, and that police could not have reasonably judged that a warrant application would interfere with other pressing needs or duties. Because Mitchell did not have a chance to attempt to make that showing, a remand for that purpose is necessary." (Emphasis added.) *Id.* at ___, 139 S. Ct. at 2539.[6]

Thus, *Mitchell* makes clear that, although the determination of exigent circumstances requires a totality-of-the-circumstances approach, courts may identify "general rules" that will apply in most cases. One of these "general rules" is that exigency will exist when BAC is dissipating and "some other factor creates pressing health, safety, or law enforcement needs that would take priority over a warrant application." *Id.* at ___, 139 S. Ct. at 2537. Two such factors have been expressly identified: (1) when there has been a traffic accident causing personal injury (*Schmerber*) and (2) when the suspect is unconscious (*Mitchell*).

### D. Application of *Patel* and *Mitchell*

¶ 57    Not surprisingly, the parties disagree over what *Patel* and *Mitchell* mean for the State's argument that section 11-501.2(c)(2) is not facially unconstitutional. Defendant argues that *Patel* confirms the statute's facial invalidity. The State originally argued that there are three valid applications of the statute: when the police have a warrant, when the defendant consents to the search, and when exigent circumstances are present. In *Patel*, the Supreme Court explained that these situations are not applications of a statute authorizing a warrantless search. Thus, according to defendant, the State has failed to identify any circumstances in which the statute operates validly, and it remains a facially unconstitutional statute setting forth a *per se* exigency. In light of *Patel*, the State has withdrawn its argument that the statute operates validly when the police have a warrant. The State now concedes that this is not an application of the statute. The State maintains, however, that the statute is distinguishable from the statute at issue in *Patel*, as it incorporates the concepts of consent and exigency. The State maintains that the statute still operates validly in at least three circumstances: (1) when a DUI suspect consents to the testing, (2) when the DUI suspect has been in a traffic accident, and (3) when the DUI suspect is unconscious.

---

[6]The plurality opinion, authored by Justice Alito, garnered the votes of three other justices. Justice Thomas concurred in the judgment. Justice Thomas argued that the natural metabolism of alcohol in the blood means that exigent circumstances are present whenever someone is suspected of driving under the influence of alcohol. *Mitchell*, 588 U.S. at ___, 139 S. Ct. at 2539-41 (Thomas, J., concurring). Because Justice Alito's opinion is based on a narrower ground, it represents the Court's holding. See *Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds….' " (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976) (plurality opinion))).

- 16 -

¶ 58        The parties also disagree as to the meaning of *Mitchell*. Defendant contends that *Mitchell* is not relevant to this case, as it addressed a narrow fact pattern not present here. According to defendant, *Mitchell* only applies to cases involving unconscious DUI suspects. Moreover, defendant emphasizes that *Mitchell* did not depart from the Court's precedents requiring a totality-of-the-circumstances approach to determining exigent circumstances. The State argues that *Mitchell* is broader than defendant contends and clearly sets forth a rule that is applicable to cases involving accidents as well as to cases involving unconscious drivers. The State points out that *Mitchell* referred to *Schmerber* as controlling and the Court referred to *Schmerber* as another case involving the general rule that exigency exists when BAC is dissipating and some other factor creates pressing needs for law enforcement. The State views section 11-501.2(c)(2) as setting forth precisely the type of general rule that the Court approved of in *Mitchell* and indeed views *Mitchell* as so significant that it has withdrawn its previous concession that defendant's fourth amendment rights were violated. The State argues that *Mitchell*'s discussion of exigency in the context of traffic accidents shows that the present case is clearly one in which exigent circumstances were present.

¶ 59        We agree with the State that *Mitchell* compels the conclusion that section 11-501.2(c)(2) is not facially unconstitutional. This statute sets forth precisely the type of general rule that the Supreme Court held will almost always support a warrantless blood test. Again, *Mitchell* explained that, although the determination of exigent circumstances requires a totality-of-the-circumstances approach, the law may recognize "general rules" that apply to frequently recurring fact patterns. *Id.* at ___ n.3, 139 S. Ct. at 2535 n.3. In *Mitchell*, the Supreme Court identified one of these general rules as "exigency exists when (1) BAC evidence is dissipating and (2) some other factor creates pressing health, safety, or law enforcement needs that would take priority over a warrant application." *Id.* at ___, 139 S. Ct. at 2537. The Court explained that it derived this rule from *Schmerber* and stated that, "[i]n *Schmerber*, the extra factor giving rise to urgent needs that would only add to the delay caused by a warrant application was a car accident; here it is the driver's unconsciousness." *Id.* at ___, 139 S. Ct. at 2537. Section 11-501.2(c)(2) sets forth just this type of general rule. This section allows warrantless testing of blood, breath, and urine *only when* "a law enforcement officer has probable cause to believe that a motor vehicle driven by or in actual physical control of a person under the influence of alcohol, other drug or drugs, or intoxicating compound or compounds, or any combination thereof has caused the death or personal injury to another." 625 ILCS 5/11-501.2(c)(2) (West 2008). Because the statute sets forth a scenario in which warrantless testing will almost always be constitutional, the statute cannot be invalid in all its applications. In fact, it is *valid* in *almost all* its applications. There was no suggestion in *Mitchell* that the Supreme Court believed that the Wisconsin statute allowing for warrantless searches of unconscious drivers was facially unconstitutional, and such a conclusion would have sounded absurd given everything else the Court said in the opinion.

¶ 60        *Patel* does not compel a different result. To see why, it is important to understand the difference between the ordinance at issue in *Patel* and section 11-501.2(c)(2). The ordinance at issue in *Patel* required hotel operators to make guest registers available for the police to search. No showing of probable cause was required, and the statute did not attempt to codify exigent circumstances. The police could simply show up and ask to see a guest register, and hotel operators were required to comply. It is easy to see why, if the police showed up with a warrant, if they asked for consent to search the register, or if they were responding to an

emergency, they were not acting pursuant to the ordinance. By contrast, section 11-501.2(c)(2) is a codified exigency. It allows a warrantless blood draw only when the police have probable cause to believe that a person has driven or been in actual physical control of a vehicle while under the influence of drugs or alcohol and that person has caused death or injury to another person. It makes no sense to say that the statute does "no work" when exigent circumstances are present, as the statute is specifically designed to operate when exigent circumstances are present. The statute sets forth precisely the type of exigency that *Mitchell* said would "almost always" allow a warrantless blood draw. Thus, it would not be correct to say that, if exigent circumstances are present, the police are not acting pursuant to section 11-501.2(c)(2) when they seek a warrantless blood draw from a DUI suspect who has caused death or personal injury to another. We find it extremely unlikely, given what it held in *Mitchell*, that the Supreme Court would hold section 11-501.2(c)(2) facially invalid under the fourth amendment. Given our identification of a situation in which section 11-501.2(c)(2) operates validly, we need not address the State's argument that the statute operates validly when the subject consents to the blood draw.

¶ 61 We next consider whether the statute was validly applied in this case. When reviewing the trial court's ruling on a motion to suppress, we may consider evidence both from the trial and the suppression hearing. *People v. Almond*, 2015 IL 113817, ¶ 55. We note that defendant moved for suppression of both the blood and urine test results and has made the same arguments with respect to both. That said, the urine test results are the significant ones, as defendant's blood tested negative for drugs or alcohol and the type of aggravated DUI defendant was convicted of was driving or being in actual physical control of a vehicle with any amount of a drug, substance, or compound in the person's blood, breath, or urine (625 ILCS 5/11-501(a)(6), (d)(1)(C), (d)(1)(F) (West 2008)). The version of section 11-501.2(c)(2) under consideration applies to tests of blood, breath, and urine and includes testing for both drugs and alcohol. None of the authority discussed above addressed urine testing for drugs. The Supreme Court has held, nevertheless, that urine testing implicates privacy concerns and is a fourth amendment search. *Skinner*, 489 U.S. at 617. The Court explained that the process of collecting a urine sample implicates privacy interests and that a urine test, like a blood test, "can reveal a host of private medical facts." *Id.* For this reason, we assume that the Supreme Court would hold that a urine test may not be conducted incident to a DUI arrest the way a breath test can but rather would require a warrant, consent, or exigent circumstances.

¶ 62 That leaves the question of whether the *Mitchell*/*Schmerber* rule applies to urine testing for drugs. The State argues that there is no principled reason why it does not. The State contends that there is an even more compelling need for blood and urine testing for drugs than for alcohol because there is no less invasive test, such as a breath test. The defendant has not challenged this part of the State's argument and has not argued that a different analysis is required for the drug tests of defendant's blood and urine. Accordingly, we will assume, without deciding, that the *Mitchell* rule applies to both the blood and urine tests.

¶ 63 In *Mitchell*, after setting forth the "general rule," the Supreme Court remanded the case so that the defendant could have a chance to show that "his blood would not have been drawn if police had not been seeking BAC information, and that police could not have reasonably judged that a warrant application would interfere with other needs or duties." *Mitchell*, 588 U.S. at ___, 139 S. Ct. at 2539. Previously, however, the Supreme Court had been clear that the burden of demonstrating exigent circumstances is on the State. See *Welsh v. Wisconsin*,

466 U.S. 740, 749-50 (1984); *Coolidge v. New Hampshire*, 403 U.S. 443, 454 (1971). *Mitchell* appears to be saying that, in cases where the "general rule" applies, the burden shifts to defendant to establish the lack of exigent circumstances.[7] Nevertheless, in *Mitchell* a remand was required because the State had not relied on the exigent circumstances exception below. Here, by contrast, the parties litigated the exigent circumstances question in the trial court, and the issue was also addressed by the appellate court. The parties agree that a remand is unnecessary, but they disagree over what the record shows. The State contends that the record establishes that exigent circumstances were present, while defendant contends they were not.

¶ 64    *Mitchell* stated that, in order to avoid application of the general rule, the defendant would have to show that his blood was drawn solely for law enforcement purposes and that the police could not have reasonably judged that a warrant application would interfere with other pressing needs or duties. The first showing is easily established here, as there is no dispute that defendant was taken to the hospital solely for the blood draw. For several reasons, we also believe that the record clearly demonstrates the second factor.

¶ 65    We find the State's concession in its initial brief significant. Reviewing this record, the State did not believe it could make a good-faith argument that exigent circumstances existed and thus conceded that defendant's fourth amendment rights were violated. The State asserted that it was "undisputed that defendant's blood and urine samples were taken in violation of the Fourth Amendment." The State withdrew that concession in its supplemental brief and said that it was doing so in light of *Mitchell*. But this assertion is perplexing, given that *Mitchell*'s discussion of exigent circumstances in DUI accident cases was a straightforward application of *Schmerber*. Indeed, *Mitchell* said that the facts before it were controlled by *Schmerber*. *Mitchell*, 588 U.S. at ___, 139 S. Ct. at 2537. *Schmerber* is a 53-year-old case. Thus, the State had the relevant law and the facts available to it when it filed its opening brief. In the appellate court, the State clearly realized that *Schmerber* was the relevant authority. In that court, the State argued that the "circumstances in the instant case align it squarely with *Schmerber* and distinguish it markedly from *McNeely*." The State then argued why the police's responsibilities in investigating the accident made this a case of exigent circumstances—the same argument that the State now makes in its supplemental brief. Thus, the State clearly could have made the exigent circumstances argument in its original brief but instead concluded that it had no choice but to concede the fourth amendment violation.

¶ 66    Given the facts, the State's original concession that sufficient exigent circumstances were lacking is not surprising. No evidence was introduced that the police ever attempted to secure a warrant. This is to be expected, as the statute told them they did not need one. The police told defendant that the law required him to give the blood and urine samples, so they were clearly proceeding under the belief that a warrant was unnecessary.

¶ 67    Moreover, the State's conduct belies any assertion that they were facing an emergency in needing to get defendant's blood and urine samples. Again, the reason that the police need to act quickly in these situations is that evidence is dissipating. Here, defendant was arrested a few minutes after 9 p.m. He was then taken to the police station, where he was not interviewed until 10:30. Officer Ventrella interviewed defendant and noticed that he smelled like alcohol. Ventrella explained that other officers were working on other aspects of the investigation. At

---

[7]We hope that the Supreme Court will eventually offer more guidance on this point.

midnight, Ventrella returned to the interview room and found defendant asleep. Ventrella woke him up and asked him to take a breath test. Defendant refused. He also refused to give blood and urine samples. Nearly three hours later, at 2:57 a.m., the officers finally took defendant to the hospital to give blood and urine samples. The blood sample was not collected until 4:10 a.m., and the urine sample was not taken until 5:20. Thus, a full seven hours passed between the time of defendant's arrest and the time of his blood sample, and nearly 8.5 hours passed before he gave the urine sample.

¶ 68    In *McNeely*, the Supreme Court stated that one of the relevant factors to consider in determining whether a warrantless search is reasonable is the practical problem of "obtaining a warrant within a timeframe that still preserves the opportunity to obtain reliable evidence." *McNeely*, 569 U.S. at 164. Here, the police waited so long to get the blood and urine samples that defendant's BAC was zero, even though he admitted to drinking Hennessy and he smelled of alcohol when Ventrella interviewed him at 10:30 p.m. It simply defies belief that the police could not have attempted to gain a warrant without significantly delaying the time of the testing. In *McNeely*, the Supreme Court stated:

> "Consider, for example, a situation in which the warrant process will not significantly increase the delay before the blood test is conducted because an officer can take steps to secure a warrant while the suspect is being transported to a medical facility by another officer. In such a circumstance, there would be no plausible justification for an exception to the warrant requirement." *Id.* at 153-54.

Here, before we even get to the hour that it took to transport defendant from the police station to the hospital, we have the *three hours* that passed between the time defendant was arrested and was asked to give blood, breath, and urine samples and, then, *another three hours* that passed between defendant's refusal and the officers taking him to the hospital. The police did not appear to be acting with any urgency to get the testing done, and with all the officers who were working on the case, it seems obvious that the police could have attempted to get a warrant without significantly increasing the delay before testing was conducted or without interfering with other pressing needs or duties. The record thus does not show sufficient exigent circumstances to dispense with a warrant. For these reasons, the general rule set forth in section 11-501.2(c)(2) does not apply here, and the statute is unconstitutional as applied to defendant's case. Accordingly, the blood and urine test results should have been suppressed.

¶ 69    Finally, although we do not find section 11-501.2(c)(2) facially unconstitutional, it is nevertheless misleading in suggesting that the facts set forth therein amount to exigent circumstances whenever they are present. Again, the facts described in section 11-501.2(c)(2) will amount to exigent circumstances in most, but not all, cases. As written, the statute tells the police that a warrant is unnecessary in *all* cases in which the police have probable cause to believe a person has driven or been in actual physical control of a vehicle under the influence of drugs or alcohol and has caused a death or injury. However, *Mitchell* explained that the general rule will not apply in those unusual cases in which the blood draw is solely for law enforcement purposes and the police could not have reasonably judged that a warrant application would interfere with other pressing needs or duties. The legislature may wish to clarify this point.

II. Reckless Homicide Instruction

¶ 71    The State next contends that the appellate court erred in holding that the trial court abused its discretion in refusing to instruct the jury on reckless homicide. The State's argument consists of two parts: first, that the appellate court failed to apply the proper standard of review and, second, that the trial court's decision was not an abuse of discretion.[8]

¶ 72    When determining whether a defendant is entitled to a jury instruction on a lesser included offense, the trial court is to consider whether there is some evidence in the record that, if believed by the jury, will reduce the crime charged to a lesser offense. *People v. McDonald*, 2016 IL 118882, ¶ 25. The trial court should not weigh the evidence when deciding whether the instruction is justified. *Id.* When the court determines that there is insufficient evidence to justify the giving of a lesser included offense instruction, the proper standard of review is abuse of discretion. *Id.* ¶ 42.

¶ 73    Defendant was charged with first degree murder under section 9-1(a)(2) of the Criminal Code of 1961 (720 ILCS 5/9-1(a)(2) (West 2008)). Under this provision, a person is guilty of first degree murder if he kills another individual without lawful justification and, in performing the acts that cause the death, "he knows that such acts create a strong probability of death or great bodily harm to that individual or another." *Id.* A person commits reckless homicide when he unintentionally kills another person with a vehicle and "his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual and he performs them recklessly." *Id.* § 9-3(a). The parties agree that reckless homicide is a lesser included offense of first degree murder. This court has held that involuntary manslaughter is a lesser included offense of first degree murder. *People v. Robinson*, 232 Ill. 2d 98, 105 (2008). Reckless homicide and involuntary manslaughter are defined in the same statute. See 720 ILCS 5/9-3 (West 2008). The only difference between the offenses is that reckless homicide is the proper charge when the cause of death "consists of the driving of a motor vehicle or operating a snowmobile, all-terrain vehicle, or watercraft." *Id.* § 9-3(a).

¶ 74    The main difference between first degree murder and the lesser offenses is the defendant's mental state. See *McDonald*, 2016 IL 118882, ¶ 51; *People v. Alsup*, 373 Ill. App. 3d 745, 750 (2007). In *DiVincenzo*, 183 Ill. 2d at 249-50, this court explained the difference between knowing murder and involuntary manslaughter (reckless homicide's companion offense) as follows:

> "Involuntary manslaughter requires a less culpable mental state than first degree murder. Under section 9-1(a)(2) of the Criminal Code of 1961, a defendant commits first degree murder when he kills an individual without lawful justification and he knows that his acts create a strong probability of death or great bodily harm. 720 ILCS 5/9-1(a)(2) (West 1994). In contrast, a defendant commits involuntary manslaughter when he performs acts that are likely to cause death or great bodily harm to another and he performs these acts recklessly. 720 ILCS 5/9-3(a) (West 1994). Recklessness is statutorily defined:

---

[8]The State does not adopt the argument of the dissent below that defendant's denial that he was the driver precluded him from obtaining a lesser included offense instruction. The State characterizes the dissent's argument as a "legally unsupported assertion."

'A person is reckless or acts recklessly, when he *consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow*, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation.' (Emphasis added.) 720 ILCS 5/4-6 (West 1994).

In general, a defendant acts recklessly when he is aware that his conduct might result in death or great bodily harm, although that result is not substantially certain to occur. See 1 W. LaFave & A. Scott, Substantive Criminal Law § 3.7(f), at 336-37 (1986); 1 T. Decker, Illinois Criminal Law 82 (1986). Reckless conduct generally involves a lesser degree of risk than conduct that creates a strong probability of death or great bodily harm."

This court further explained in *DiVincenzo* that the defendant's mental state may be inferred from circumstantial evidence and that this task is "particularly suited to the jury." *Id.* at 252; see also *People v. Jones*, 404 Ill. App. 3d 734, 744 (2010) (whether a defendant acted knowingly or recklessly is generally a question for the trier of fact).

¶ 75    The State first argues that the appellate court applied the wrong standard of review. Although the appellate court acknowledged that the standard of review is abuse of discretion (2017 IL App (1st) 142837, ¶ 33), the State contends that the appellate court really applied *de novo* review. The State contends that the appellate court reviewed the evidence, found sufficient evidence to justify a reckless homicide instruction, and then substituted its judgment for that of the trial court. We need not dwell too long on this argument, as we will be reviewing the trial court's decision ourselves.

¶ 76    We briefly note, however, that we disagree with the State's characterization of the appellate court's analysis. As we explained in *McDonald*, although the standard of review is abuse of discretion, "[c]ommon sense dictates that, for a reviewing court to determine whether the trial court abused its discretion, it must undertake a review of the relevant evidence." *McDonald*, 2016 IL 118882, ¶ 32. The appellate court found an abuse of discretion based on (1) this court's authority that questions as to a defendant's mental state are generally for the jury (2017 IL App (1st) 142837, ¶ 34 (citing *DiVincenzo*, 183 Ill. 2d at 253)) and (2) its determination that the type of evidence in this case has been found sufficient in other cases to support reckless homicide convictions (*id.* ¶¶ 35-38)).

¶ 77    We agree with the appellate court that the trial court abused its discretion in denying defendant's request for a reckless homicide instruction. As we explained above, there need only be some evidence in the record that would justify giving the lesser included offense instruction. The difficulty in cases such as this is that the difference between the offenses involves the defendant's mental state and a defendant's mental state often needs to be inferred from circumstantial evidence. See *DiVincenzo*, 183 Ill. 2d at 252; *People v. Yeoman*, 2016 IL App (3d) 140324, ¶ 19. Moreover, courts have typically focused on the same factors in finding the evidence sufficient to prove reckless homicide and knowing murder.

¶ 78    For instance, in finding the evidence sufficient to support a reckless homicide conviction, courts have focused on such factors as driving while intoxicated, driving at an excessive speed, disobeying traffic signals or lane markings, and fleeing the scene of the accident. See, *e.g.*, *Belk*, 203 Ill. 2d at 189-90, 195 (intoxicated defendant's attempt to elude capture by driving

- 22 -

over 100 miles per hour on a stretch of Western Avenue with numerous restaurants and establishments open for business and pedestrians on the sidewalks would support an inference of recklessness sufficient for a reckless homicide conviction); *People v. Allen*, 368 Ill. 368 (1938) (conviction of voluntary manslaughter with an automobile supported by evidence that driver drove in the wrong lane of traffic on Dearborn Street at over 60 miles per hour and then fled the scene of the accident); *People v. Beck*, 295 Ill. App. 3d 1050, 1060 (1998) (reckless homicide conviction supported by evidence that the defendant drove while intoxicated, had his headlights off at night, and crossed into the wrong lane of traffic); *People v. Mancinelli*, 232 Ill. App. 3d 211, 218 (1992) (reckless homicide conviction supported by evidence that the defendant drove his motorcycle 75 to 100 miles per hour at night while trying to smoke a cigarette and attempted to pass another motorcycle in the same lane of traffic); *People v. Seals*, 218 Ill. App. 3d 799, 802 (1991) (reckless homicide conviction supported by evidence that the defendant drove at a high rate of speed the wrong way on a one-way street and disobeyed a traffic signal); *People v. Robinson*, 199 Ill. App. 3d 494, 502 (1990) (reckless homicide conviction supported by evidence that the defendant drove at twice the speed limit while intoxicated); *People v. Gittings*, 136 Ill. App. 3d 655, 660-61 (1985) (evidence sufficient to support reckless homicide conviction where the intoxicated defendant led police on a high-speed chase and was driving at speeds of up to 90 miles per hour in 55-mile-per-hour and 35-mile-per-hour zones and at 60 to 65 miles per hour on curves with cautionary speed limits of 20 miles per hour); *People v. Rowe*, 9 Ill. App. 3d 460, 462-63 (1972) (involuntary manslaughter conviction supported by evidence that driver swerved around one vehicle and struck it, fled the scene of the accident, drove more than 70 miles per hour on city street, violated a traffic signal, and failed to yield the right of way); *People v. Baier*, 54 Ill. App. 2d 74, 76-78 (1964) (reckless homicide conviction supported by evidence that defendant drove at an excessive speed and failed to stop at a stop sign).

¶ 79     Courts have focused on similar factors in finding defendants guilty of knowing murder. See, *e.g.*, *People v. Oelerich*, 2017 IL App (2d) 141281, ¶ 64 (evidence sufficient to convict defendant of first degree murder where defendant drove at twice the speed limit, crossed the median, and rammed his car directly into another one in the other lane of traffic); *Alsup*, 373 Ill. App. 3d at 747-48, 754 (evidence sufficient to convict the defendant of first degree murder where he led police on a high-speed chase, ignored at least 12 traffic control devices, drove through residential neighborhoods at over 50 miles per hour and on the interstate at over 100 miles per hour, tried to ram a police car, and drove through a red light at no less than 64 miles per hour); *People v. Stevens*, 324 Ill. App. 3d 1084, 1093-94 (2001) (defendant properly convicted of first degree murder based on evidence that he drove over 100 miles per hour, drove on the shoulder of the expressway, weaved through traffic, and refused to stop for marked police units, all while his passenger was begging him to stop the car); *People v. Thomas*, 266 Ill. App. 3d 914, 926 (1994) (defendant's first degree murder conviction supported by evidence that he led police on a high-speed chase on a street congested with heavy traffic, did not slow down when approaching an obstruction, and drove through a red light at 70 miles per hour).

¶ 80     Significantly, however, the juries in *Oelerich*, *Alsup*, and *Thomas* were instructed on reckless homicide. See *Oelerich*, 2017 IL App (2d) 141281, ¶ 48; *Alsup*, 373 Ill. App. 3d at 748; *Thomas*, 266 Ill. App. 3d at 925. Although ultimately the juries in these cases found the evidence sufficient to convict the defendants of first degree murder, it was left to the jurors to

infer the defendants' mental states from the evidence. And this is perfectly consistent with what this court explained in *DiVincenzo*: the task of inferring the defendant's mental state from the surrounding circumstances is "particularly suited to the jury." *DiVincenzo*, 183 Ill. 2d at 252. Here, the trial court took the decision away from the jury.

¶ 81    The court explained in denying the request for the instruction that this was a case of "first degree murder or not guilty" and not a case of "first degree murder or reckless homicide or not guilty." We disagree. Madeline Moratto testified that the accident happened on a "quiet residential street" in a "quiet neighborhood." The jury could have possibly inferred from the fact that the defendant's conduct occurred in a quiet neighborhood at 9 p.m. in December that defendant's mental state was reckless rather than knowing—an inference that would be more difficult if the defendant had driven the same way on a busy street in the middle of a summer day. But the jury was never given this option. Ironically, the trial court gave the best explanation why its decision was an abuse of discretion. In explaining why it had denied the instruction, the trial court explained:

> "I believed then and I believe now that there is a line past which reckless homicide becomes conduct as to which the person committing those acts knows that such acts create a strong probability of death or great bodily harm to individuals or to other unspecified persons. I will admit, and I believe I admitted then, I don't know where that line is."

But this is precisely the problem. The jury may well have drawn the line in a different place. Juries in other cases have found that similar conduct to what happened here supported a verdict of first degree murder; others have found similar conduct supportive of a reckless homicide conviction. We will never know what this jury would have done if instructed on reckless homicide, as the court took that decision away from the jury.

¶ 82    In arguing in support of the trial court's decision that this could only be a case of murder, the State (as did the trial court) focuses on the severity of the victims' injuries. Citing *People v. Ward*, 101 Ill. 2d 443 (1984), and *People v. Fenderson*, 157 Ill. App. 3d 537 (1987), the State contends that severe injuries can justify the denial of an involuntary manslaughter instruction because such injuries can negate any inference that the defendant's conduct was merely reckless. But these cases are easily distinguishable, as they involved physical beatings rather than traffic accidents. In *Ward*, this court found the denial of an involuntary manslaughter instruction appropriate where the defendant beat a four-year-old boy to death. *Ward*, 101 Ill. 2d at 453. This court focused on the size disparity between the defendant and the victim, as well as the "sickening severity" of the boy's injuries. *Id.* at 452. In *Fenderson*, the defendant killed a woman who was working for him as a prostitute. *Fenderson*, 157 Ill. App. 3d at 541. The evidence showed that the victim had been burned over 20 to 25% of her body while still alive. *Id.* at 542. The victim died from several blows to the head, and she also suffered hemorrhaging in her chest and legs and had two broken ribs. *Id.* The court held that the denial of an involuntary manslaughter instruction was appropriate where the severity of the injuries negated any inference that the defendant's conduct was merely reckless. *Id.* at 548.

¶ 83    This same reasoning obviously does not apply in cases in which a defendant hits a pedestrian with a car. A defendant who drives a car in a reckless manner is just as likely to inflict catastrophic injuries on a pedestrian as one who is driving with a knowing mental state. Indeed, several of the reckless homicide cases cited above involved intoxicated drivers who

- 24 -

drove at excessive rates of speed. Clearly such behavior would result in severe injuries to pedestrians hit by these vehicles. It is simply not possible to determine a driver's mental state from the severity of injuries he inflicts on a pedestrian.

¶ 84   The State also relies on *McDonald*, wherein this court listed the following factors as probative in deciding whether an involuntary manslaughter instruction is warranted:

"(1) the disparity of size and strength between the defendant and the victim, (2) the duration of the altercation and the severity of the victim's injuries, (3) whether the defendant used a weapon, (4) whether the defendant inflicted multiple wounds, and (5) whether the victim was defenseless." *McDonald*, 2016 IL 118882, ¶ 52.

But the State cites no authority applying these factors to the decision whether to instruct the jury on *reckless homicide*. And it is not surprising that no such authority exists, as these factors make no sense in that context. When a driver is charged with knowing murder arising out of a traffic accident, applying these factors would in no way be helpful in determining whether a reckless homicide instruction is warranted. We fail to see how these factors support the trial court's decision to deny the instruction.

¶ 85   For all of the above reasons, we agree with the appellate court that the trial court abused its discretion in refusing to instruct the jury on reckless homicide. Accordingly, defendant is entitled to a new trial on the first degree murder charge.

¶ 86                                III. Failure to Report

¶ 87   The State next argues that the appellate court erred in reducing defendant's "failure to report" conviction from the Class 1 felony version of the offense to the Class 4 version. The appellate court determined that the State could not prove the Class 1 version without impermissibly relying on defendant's postarrest silence. The State raises two arguments. First, the State contends that defendant forfeited the self-incrimination argument by raising it for the first time in his reply brief in the appellate court. In his opening brief, defendant had challenged his conviction solely on sufficiency of the evidence grounds. Second, the State contends that the evidence was sufficient to convict defendant of the Class 1 version of the offense and no fifth amendment concerns were implicated by drawing inferences from defendant's voluntary statements.

¶ 88   Section 11-401(a) of the Vehicle Code provides:

"(a) The driver of any vehicle involved in a motor vehicle accident resulting in personal injury to or death of any person shall immediately stop such vehicle at the scene of such accident, or as close thereto as possible and shall then forthwith return to, and in every event shall remain at the scene of the accident until the requirements of Section 11-403 have been fulfilled. Every such stop shall be made without obstructing traffic more than is necessary." 625 ILCS 5/11-401(a) (West 2008).

If a driver fails to comply with subsection (a), the requirements of subsection (b) kick in. This subsection provides:

"(b) Any person who has failed to stop or to comply with the requirements of paragraph (a) shall, as soon as possible but in no case later than one-half hour after such motor vehicle accident, or, if hospitalized and incapacitated from reporting at any time during such period, as soon as possible but in no case later than one-half hour after being discharged from the hospital, report the place of the accident, the date, the

approximate time, the driver's name and address, the registration number of the vehicle driven, and the names of all other occupants of such vehicle, at a police station or sheriff's office near the place where such accident occurred. No report made as required under this paragraph shall be used, directly or indirectly, as a basis for the prosecution of any violation of paragraph (a)." *Id.* § 11-401(b).

A violation of subsection (a) is a Class 4 felony. *Id.* § 11-401(c). A violation of subsection (b) is a Class 2 felony if the accident did not involve the death of any person and a Class 1 felony if it did. *Id.* § 11-401(d). Establishing a violation of subsection (b) necessarily requires the State to prove a negative: the State must prove that the defendant did not report the offense within half an hour.

¶ 89    In his opening brief in the appellate court, defendant challenged his conviction solely on sufficiency of the evidence grounds. Defendant captioned his argument as follows: "Eubanks'[s] Class [1] conviction for failure to report a motor vehicle accident involving death must be reversed where the State failed to prove the enhancing element that Eubanks failed to report the accident at a police station within a half hour." Defendant then argued that the State had not introduced any evidence of what, if anything, defendant said during the half hour following his arrest. Further, defendant contended, the State had not introduced any evidence from which the trier of fact could have inferred that defendant had failed to report the accident within half an hour. Because of this alleged failure of proof, defendant argued that his conviction should be reduced to the Class 4 version of the offense.

¶ 90    When the appellate court issued its opinion, however, it described defendant's argument as follows: "Eubanks next contends that his conviction for failure to report the accident within half an hour must be reversed because he was arrested around 10 minutes after the accident and any evidence of his postarrest silence cannot be used against him." 2017 IL App (1st) 142837, ¶ 43. The appellate court agreed with this argument and held that defendant's guilt could not be established because he was arrested within half an hour of the accident and any evidence of his postarrest silence could not be used against him. *Id.* ¶¶ 46, 49. As the State points out—although the appellate court did not use this language—the court's decision essentially amounts to a holding that the statute is unconstitutional as applied to any driver who is arrested within 30 minutes of the accident.

¶ 91    So how did we get from argument A—that the State failed to prove defendant guilty in this particular case—to holding B—that the State cannot establish the guilt of any driver arrested within half an hour of the accident without improperly relying on evidence of the defendant's postarrest silence? This argument was first raised in defendant's reply brief in the appellate court. When defendant filed his reply brief, he changed the caption of this argument by replacing the phrase "the State *failed to* prove the enhancing element that Eubanks failed to report the accident" with "the State *could not* prove the enhancing element that Eubanks failed to report the accident." (Emphases added.) Defendant now argued that the State could not prove the enhancing element of failing to report the accident at a police station in any case in which the arrestee is in custody and facing charges, given an arrestee's right against self-incrimination. Defendant contended that he could not have complied with section 11-401 without incriminating himself and that, because Illinois law bars the State from introducing evidence of a defendant's postarrest silence, the State could not prove that he failed to report the accident without infringing his privilege against self-incrimination.

¶ 92    In its appellee's brief below, the State relied on *People v. Moreno*, 2015 IL App (2d) 130581, in support of its argument that the State had established defendant's guilt beyond a reasonable doubt. *Moreno* held that the court could infer from a defendant's subsequent denials of any involvement in the automobile accident that he had not reported the accident within the first half hour after the collision. *Id.* ¶¶ 24-25. In defendant's reply brief he argued that the court should decline to follow *Moreno* because it impermissibly draws an adverse inference from a defendant's failure to incriminate himself on charges for which he is in custody.

¶ 93    The appellate court addressed the issue defendant raised in his reply brief rather than the issue he raised in his opening brief. The dissent pointed out that defendant had merely raised a sufficiency of the evidence argument and criticized the majority for making a self-incrimination argument for him. See 2017 IL App (1st) 142837, ¶¶ 109-10 (Pucinski, J, dissenting). The dissent's criticism is not entirely accurate. Defendant *did* raise a self-incrimination issue, but he did so for the first time in his reply brief.

¶ 94    Nevertheless, we do not need to resolve the State's forfeiture argument, as defendant concedes in this court that his argument remains one of failure of proof. Defendant does not ask this court to make the broad ruling that the appellate court made. Although defendant argues that an as-applied constitutional challenge may be appropriate in some future case, defendant contends that he forfeited any such challenge by failing to raise it in the trial court. See *People v. Harris*, 2018 IL 121932, ¶¶ 39-41. Thus, according to defendant, his "argument remains that the State did not sustain its evidentiary burden where there was little, if any, evidence about what Eubanks did or did not say during the first half hour after the offense occurred."

¶ 95    Accordingly, we will address the argument that defendant raised in his opening brief in the appellate court and that defendant insists remains his argument in this court: that the State failed to prove him guilty beyond a reasonable doubt of the Class 1 version of failure to report. Defendant contends that the State failed to present sufficient evidence that he failed to report the accident at a police station within half an hour of the accident. When reviewing a challenge to the sufficiency of the evidence, our function is not to retry the defendant. *People v. Smith*, 185 Ill. 2d 532, 541 (1999). Rather, this court considers whether, viewing the evidence in the light most favorable to the State, " '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). A trier of fact is not required to disregard inferences that flow normally from the evidence before it, nor must the trier of fact search out all possible explanations consistent with innocence and raise those explanations to a level of reasonable doubt. *People v. Campbell*, 146 Ill. 2d 363, 380 (1992). Further, a reviewing court must allow all reasonable inferences from the record in favor of the prosecution. *People v. Davison*, 233 Ill. 2d 30, 43 (2009).

¶ 96    Here, the evidence was easily sufficient to establish defendant's guilt beyond a reasonable doubt. First, it was clear from the evidence that defendant had no intention of reporting the accident. After hitting Maria and Jeremiah, defendant failed to stop the car, telling Tanner, "It's too late." When Tanner finally got defendant to stop the car, Tanner tried to convince defendant to return to the scene of the accident with him. Defendant refused and sped away instead. Second, Officer Dan Postelnick of the Chicago Police Department testified that he works for the major accident unit. On the night of the accident, he arrived at work at 10:30

p.m. He was assigned to work on the Worthon accident, and his first assignment was to go to the area where the arrestee was being held. He arrived there at 11:20 p.m. Postelnick learned that the arrestee was named Ralph Eubanks and that he had been placed in a room with electronic recording equipment. Part of Postelnick's investigation was to find out if defendant had reported any aspects of the accident. Postelnick spoke to other officers and learned that defendant had not reported anything. Defendant now refers to Postelnick's testimony as "vague hearsay testimony," but defendant did not object to Postelnick's testimony on hearsay or any other grounds and even now does not argue that it was improperly admitted. Third, a videotape of defendant's statement showed the following exchange at 10:30 p.m.:

"DEFENDANT: You could've let me go. That would have been nice.

OFFICER: Can't do that.

DEFENDANT: I didn't do anything. I'm still trying to figure out what I'm being charged with."

Finally, defendant's denial of being involved in the accident continued right through the trial. Defendant testified at trial that he was not in the car when the accident occurred. Thus, the jury could have reasonably inferred from defendant's consistent denials that he was involved in the accident that he had not reported the accident at a police station within 30 minutes. See *Moreno*, 2015 IL App (2d) 130581, ¶ 25 ("given that [the defendant] was still denying his involvement during the taped interview, the trier of fact could have reasonably inferred that he did not previously report it"); *People v. Gutierrez*, 105 Ill. App. 3d 1059, 1064 (1982) ("the defendant on each occasion denied his involvement in the transaction which left the reasonable inference that he had not reported"); *People v. Johnson*, 79 Ill. App. 2d 226, 230-31 (1967) (the defendant's testimony that he was unaware of the accident and statement to the police that he did not recall hitting anyone was sufficient evidence that he had not reported the accident). Defendant refers to the inference that defendant did not report as mere speculation and argues that it is possible that defendant reported the accident and then forgot or that he reported the accident and then recanted. The standard of review, however, requires that we draw all reasonable inferences in favor of the State. *Davison*, 233 Ill. 2d at 43. There was clearly sufficient evidence for a rational trier of fact to conclude beyond a reasonable doubt that defendant did not report the accident within half an hour.

¶ 97        As to defendant's claim that drawing the above inference burdens his privilege against self-incrimination, we offer two observations. First, the reasonable inference we describe above is not an inference from defendant's *silence*. Rather, it is a reasonable inference from defendant's *voluntary statements*. Second, the appellate court relied on three cases in stating that a defendant's postarrest silence is not admissible for any purposes in the State's case-in-chief: *People v. Nesbit*, 398 Ill. App. 3d 200, 212 (2010); *Simmons*, 293 Ill. App. 3d at 811; and *People v. Strong*, 215 Ill. App. 3d 484, 488 (1991). In *Nesbit*, the defendant argued that he was entitled to a new trial because the prosecution elicited testimony about his postarrest silence. *Nesbit*, 398 Ill. App. 3d at 211. In *Simmons*, the defendant argued that he was entitled to a new trial because the prosecutor elicited testimony about his postarrest silence and then commented on it in closing argument. *Simmons*, 293 Ill. App. 3d at 810-11. In *Strong*, the appellate court addressed the issue of postarrest silence after it had already granted the defendant a retrial on another basis. The court stated that, because it did not know how the testimony would play out on retrial, it could not say whether defendant's silence would be admissible for impeachment

- 28 -

purposes but held that the defendant's silence would not be admissible for any purpose in the State's case-in-chief. *Strong*, 215 Ill. App. 3d at 487-88. In this case, by contrast, defendant does not argue that he should receive a new trial on failure to report. He has not identified *any* evidence that was erroneously admitted in the prosecution's case-in-chief. Nor has defendant asserted that, in closing argument, the prosecutor commented on defendant's silence. Rather, his argument is simply one of failure of proof. Here, for the reasons set forth above, the State met its burden of proof.

¶ 98        We emphasize that we are not addressing the issue the way that the appellate court did, nor are we determining the propriety of any of the evidence that the State introduced. Rather, we are simply resolving the precise issue that the defendant raised in his opening brief in the appellate court, which defendant maintains is still the only issue he's raising: that the State failed to establish beyond a reasonable doubt his guilt of the Class 1 version of the offense. Because we find that the State met its burden, we reverse the appellate court's judgment reducing defendant's conviction to the Class 4 version of the offense and reinstate defendant's Class 1 conviction.

¶ 99                                            CONCLUSION

¶ 100       We reverse the appellate court's judgment that section 11-501.2(c)(2) is facially unconstitutional and hold instead that it is unconstitutional as applied to defendant's case. We affirm the appellate court's judgment reversing the trial court's denial of defendant's motion to suppress the blood and urine test results. Because the State cannot prove the aggravated DUI charge without that evidence, we affirm the appellate court's judgment reversing that conviction outright. We affirm the appellate court's judgment reversing defendant's first degree murder conviction and remanding for a new trial. At that trial, the State may not introduce evidence of defendant's blood and urine test results. Finally, we reverse the appellate court's judgment reducing defendant's failure to report conviction to the Class 4 version of the offense, and we reinstate defendant's Class 1 conviction of failure to report.

¶ 101       Appellate court judgment affirmed in part and reversed in part.

¶ 102       Circuit court judgment affirmed in part and reversed in part.

¶ 103       Cause remanded.

¶ 104       CHIEF JUSTICE BURKE, specially concurring:

¶ 105       I agree with the majority in affirming the appellate court's finding that the trial court abused its discretion when it denied defendant's request for a reckless homicide instruction. Accordingly, I agree that defendant's first degree murder conviction must be reversed and the matter remanded for a new trial on the charge of murder. I also agree with the majority that the appellate court erred when it reduced defendant's conviction for failure to report a motor vehicle accident from a Class 1 felony, pursuant to section 11-401(b) of the Illinois Vehicle Code, to a Class 4 felony, pursuant to section 11-401(a) of the Vehicle Code. See 625 ILCS 5/11-401(a), (b) (West 2008). Like the majority, I believe the evidence presented at trial was sufficient to support defendant's Class 1 conviction for failure to report and, therefore, that conviction is properly reinstated. I write separately to explain my understanding of *Mitchell v. Wisconsin*, 588 U.S. ___, 139 S. Ct. 2525 (2019), and its application to this case on the question

of whether section 11-501.2(c)(2) of the Vehicle Code (625 ILCS 5/11-501.2(c)(2) (West 2008)) is facially unconstitutional.

¶ 106    In *Mitchell*, the question before the United States Supreme Court was the constitutionality of Wisconsin's "implied consent" laws. Wisconsin's laws, like the implied consent laws in all 50 states, are based on the notion that, as a condition of the privilege of using public roads, a driver is presumed to have consented to blood alcohol content (BAC) testing when there is sufficient reason to believe that the driver is violating the state's drunk driving laws. *Mitchell*, 588 U.S. at ___, 139 S. Ct. at 2531. Because a driver impliedly consents to testing, there is no need to obtain a warrant, which would typically be required for a lawful search. Generally, implied consent laws further provide that a driver may refuse testing, *i.e.*, may withdraw consent, but by doing so, the driver will suffer the revocation of his or her license. *Id.* at ___, 139 S. Ct. at 2531-32. In this way, implied consent laws "incentivize prompt BAC testing." *Id.* at ___, 139 S. Ct. at 2536.

¶ 107    Wisconsin's implied consent laws include a provision that directs police officers on how to proceed in the situation where the suspected drunk driver is unconscious. The law provides that, when the driver is unconscious, the police may obtain a warrantless blood draw because an unconscious driver is presumed *not* to have withdrawn the statutorily implied consent. *Id.* at ___, 139 S. Ct. at 2532.

¶ 108    The defendant in *Mitchell* was suspected of driving while intoxicated and was arrested. While being transported to the police station for evidentiary breath testing, the defendant fell into an unconscious stupor. As a result, the police took him to the hospital, where his blood was drawn without first obtaining a warrant. *Id.* at ___, 139 S. Ct. at 2532. A plurality of the Supreme Court, when deciding the constitutionality of the blood draw, did not answer the broader question of the constitutionality of implied consent laws but, rather, answered the narrower question of " '[w]hether a statute authorizing a blood draw from an unconscious motorist provides an exception to the Fourth Amendment warrant requirement.' " *Id.* at ___ n.5, 139 S. Ct. at 2546 n.5.

¶ 109    The *Mitchell* plurality first reaffirmed that a warrantless BAC test may not be legally obtained when the only exigency is dissipation of alcohol in the blood. Rather, the plurality held, "exigency exists when (1) BAC evidence is dissipating and (2) some other factor creates pressing health, safety, or law enforcement needs that would take priority over a warrant application." *Id.* at ___, 139 S. Ct. at 2537; see *Schmerber v. California*, 384 U.S. 757, 770 (1996); *Missouri* v. *McNeely*, 569 U.S. 141, 150-51 (2013). The plurality then held that both conditions were met in that case, where the defendant was suspected of drunk driving and he became unconscious before he could submit to a breath test at the police station. Thus, the plurality concluded that, in situations where the "police have probable cause to believe a person has committed a drunk-driving offense and the driver's unconsciousness or stupor requires him to be taken to the hospital or similar facility before police have a reasonable opportunity to administer a standard evidentiary breath test, they may *almost always* order a warrantless blood test to measure the driver's BAC without offending the Fourth Amendment." (Emphasis added.) *Mitchell*, 588 U.S. at ___, 139 S. Ct. at 2539. The plurality noted that the possibility exists that, in an unusual case, the police could not have reasonably judged that a warrant application would interfere with other pressing needs or duties. Thus, the plurality remanded

the matter to permit the defendant to attempt to make a showing that his was such a case. *Id.* at ___, 139 S. Ct. at 2539.

¶ 110    In reaching its conclusion, the plurality, in effect, held that Wisconsin's implied consent statute served as a codified exigency that creates a rebuttable presumption that a warrantless blood draw is constitutional if the suspected drunk driver is unconscious and cannot submit to an evidentiary breath test.

¶ 111    Similarly, in the case before this court, section 11-501.2(c)(2) of our Vehicle Code serves as a codified exigency creating a rebuttable presumption that the warrantless BAC testing permitted by the statute is a constitutional search. Section 11-501.2(c)(2), at the time in question, provided in pertinent part:

> "Notwithstanding any ability to refuse under this Code to submit to these tests or any ability to revoke the implied consent to these tests, if a law enforcement officer has probable cause to believe that a motor vehicle driven by or in actual physical control of a person under the influence of alcohol, other drug or drugs, or intoxicating compound or compounds, or any combination thereof has caused the death or personal injury to another, that person shall submit, upon the request of a law enforcement officer, to a chemical test or tests of his or her blood, breath or urine for the purpose of determining the alcohol content thereof or the presence of any other drug or combination of both." 625 ILCS 5/11-501.2(c)(2) (West 2008).

¶ 112    I agree with the majority that *Mitchell* compels the conclusion that section 11-501.2(c)(2) is not facially unconstitutional. As the plurality held in *Mitchell*, exigency exists when (1) BAC evidence is dissipating and (2) some other factor creates pressing health, safety, or law enforcement needs that would take priority over a warrant application. Here, too, both conditions are met. Section 11-501.2(c)(2) permits warrantless BAC testing when (1) a police officer reasonably believes that a person is driving while intoxicated and (2) that person has caused a motor vehicle accident resulting in death or serious injury. An intoxicated person's blood alcohol dissipates over time, making prompt testing a major factor in finding exigency. A motor vehicle accident causing death or personal injury is the "other factor" that creates a pressing law enforcement need that reasonably would take priority over a warrant application. Thus section 11-501.2(c)(2), like the statute in *Mitchell*, sets forth a "codified exigency" that *almost always* will authorize warrantless BAC testing without offending the fourth amendment.

¶ 113    However, as noted in *Mitchell*, there may be situations where the police could not reasonably have judged that a warrant application would interfere with other pressing needs or duties. Thus, section 11-501.2(c)(2) does not create a *per se* exigency. Rather, it creates a rebuttable presumption that a prompt warrantless search conducted pursuant to the statute is constitutionally valid. In my view, interpreting section 11-501.2(c)(2) as creating a rebuttable presumption that a warrantless search is constitutionally valid, as the Supreme Court similarly did in *Mitchell*, is what saves this statute from being facially unconstitutional.

¶ 114    Of course, in the present case, the facts clearly demonstrate that the presumption that the warrantless search conducted pursuant to section 11-501.2(c)(2) is constitutional cannot stand. After the police arrested defendant and took him to the police station, the officers did not promptly seek BAC testing. Instead, they waited several hours before taking defendant to the hospital, where he was compelled to submit to blood and urine testing. Under these

circumstances the police officers could not have reasonably judged that a warrant application would interfere with other pressing needs or duties. Accordingly, the presumption that the BAC testing performed in this case was a constitutionally valid search is rebutted. Therefore, I agree with the majority that defendant's conviction for aggravated DUI must be reversed outright.

¶ 115    JUSTICE THEIS, concurring in part and dissenting in part:

¶ 116    I agree with the majority's conclusion that defendant was entitled to a reckless homicide instruction and with its reinstatement of his Class 1 felony conviction for failure to report the accident. However, I would find that section 11-501.2(c)(2) of the Illinois Vehicle Code (625 ILCS 5/11-501.2(c)(2) (West 2008)) is facially unconstitutional because it authorizes officers to disregard the fourth amendment's warrant requirement for chemical testing of a suspected drunk driver based on the severity of injury to a third party. Neither *Mitchell v. Wisconsin*, 588 U.S. ___, 139 S. Ct. 2525 (2019), nor *Schmerber v. California*, 384 U.S. 757 (1966), stands for the proposition that suspected intoxication, plus death or a serious injury to someone *other than the driver*, presents a "codified exigency" that justifies acting without a warrant.

¶ 117    In *Schmerber*, officers arrested the defendant at the hospital where he was being treated for injuries suffered as the driver in an accident. 384 U.S. at 758. The defendant's blood was drawn without his consent, and the sample revealed his intoxication. *Id.* at 758-59. In resolving whether the officer was required to obtain a warrant, the United States Supreme Court observed that the "importance of informed, detached and deliberate determinations of the issue whether or not to invade another's body in search of evidence of guilt" was "indisputable and great." *Id.* at 770. Yet, it determined that the officer "might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant *** threatened 'the destruction of evidence.' " *Id.* (quoting *Preston v. United States*, 376 U.S. 364, 367 (1964)). Observing that the percentage of alcohol in a person's blood begins to diminish soon after he stops drinking, the Court noted that officers had to take the accused to the hospital and to investigate the accident, which left "no time to seek out a magistrate and secure a warrant." *Id.* at 770-71. Under those "special facts," the Court concluded that the officer's behavior was reasonable. *Id.* at 771.

¶ 118    Nearly 50 years later, in *Missouri v. McNeely*, 569 U.S. 141, 145-46 (2013), an officer took the defendant to the hospital for blood testing after he twice refused to provide a breath sample. Based on a state implied consent statute, the officer ordered a lab technician to take a blood sample from the defendant. The Court recognized that "a compelled physical intrusion beneath [his] skin and into his veins to obtain a sample of his blood for use as evidence in a criminal investigation" was "an invasion of bodily integrity" that "implicate[d] an individual's 'most personal and deep-rooted expectations of privacy.' " *Id.* at 148 (quoting *Winston v. Lee*, 470 U.S. 753, 760 (1985)). Hence, courts must look to the totality of circumstances to "determine whether a law enforcement officer faced an emergency that justified acting without a warrant." *Id.* at 149.

¶ 119    The Court concluded that, "[i]n those drunk-driving investigations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment *mandates* that they do so." (Emphasis added.) *Id.* at 152. Due to "advances in the 47 years since *Schmerber* was decided that allow for the more expeditious processing of warrant applications," the Court held that the

- 32 -

natural dissipation of alcohol in the blood did not categorically support a finding of exigency. *Id.* at 154, 156.

¶ 120    Recently, in *Mitchell*, 588 U.S. at ___, 139 S. Ct. at 2531, the Court "consider[ed] what police officers may do in a narrow but important category of cases: those in which the driver is unconscious and therefore cannot be given a breath test." At issue was the constitutionality of a state implied consent law that provided, in relevant part, that an unconscious driver is presumed not to have withdrawn his consent to breath or blood tests. In such cases, where a breath test would be impossible and where "it is very likely that the driver would be taken to an emergency room and that his blood would [otherwise] be drawn for diagnostic purposes," the Court ruled that a warrant generally is not needed. *Id.* at ___, 139 S. Ct. at 2531. The Court repeatedly limited its holding to cases involving unconscious drivers, ruling that, "[i]n those cases, the need for a blood test is compelling, and an officer's duty to attend to more pressing needs may leave no time to seek a warrant." *Id.* at ___, 139 S. Ct. at 2535. It explained that "exigency exists when (1) BAC evidence is dissipating and (2) some other factor creates pressing health, safety, or law enforcement needs that would take priority over a warrant application." *Id.* at ___, 139 S. Ct. at 2537.

¶ 121    The factors that created pressing needs in *Mitchell* were (1) the driver's unconsciousness, which rendered a breath test impossible and made enforcement of the drunk-driving laws dependent upon the administration of a blood test, (2) the fact that "when a police officer encounters an unconscious driver, it is very likely that the driver would be taken to an emergency room and that his blood would be drawn for diagnostic purposes even if the police were not seeking BAC information," and (3) that "officers most frequently come upon unconscious drivers when they report to the scene of an accident, and under those circumstances, the officers' many responsibilities—such as attending to other injured drivers or passengers and preventing further accidents—may be incompatible with the procedures that would be required to obtain a warrant." *Id.* at ___, 139 S. Ct. at 2531.

¶ 122    The majority extrapolates from *Mitchell* and *Schmerber* that warrantless testing under section 11-501.2(c)(2) "will almost always be constitutional" because the driver is suspected of being under the influence and a third party is gravely injured or killed. See *supra* ¶ 59. There is no basis for that conclusion when the injury is to a third party. The factors highlighted in *Mitchell*, including that a breath test would be impossible for an unconscious driver and that such a driver likely would have had his blood drawn for diagnostic purposes even if the police were not seeking BAC information, are conspicuously absent when the driver is not the injured party. And though in *Mitchell* the Court stated that "the ramifications of a car accident pushed *Schmerber* over the line into exigency" (588 U.S. at ___, 139 S. Ct. at 2538), those ramifications included the driver himself being injured and arrested at the hospital and the fact that it took longer to process warrant applications in 1966 than it does now. See *Schmerber*, 384 U.S. at 758; *McNeely*, 569 U.S. at 154.

¶ 123    The majority asserts that section 11-501.2(c)(2) codifies exigency in these circumstances. See *supra* ¶ 60. In *McNeely*, 569 U.S. at 153-54, however, the Court observed that, where one "officer can take steps to secure a warrant while the suspect is being transported to a medical facility by another officer," there "would be no plausible justification for an exception to the warrant requirement." If the availability of another officer to obtain a warrant demonstrates a lack of exigency when the driver is injured, that same logic must be true when a third party is

injured. Thus, the majority's presumption that the death of, or significant injury to, a third party means that officers almost always will not have time to procure a warrant is incorrect.

¶ 124     Take this case, for example. Defendant struck the victims with his vehicle around 9 p.m. Officers apprehended him shortly thereafter. The ambulance and paramedics were called, and the officers appear to have spoken with at least four witnesses. See *supra* ¶¶ 12-14. Officers doubtlessly had a variety of tasks to perform in connection with what was presumably a complex crime scene, yet those other responsibilities apparently played no role in their decision to bypass the fourth amendment's warrant requirement. Officers had ample time to seek a warrant, but nothing suggests that they even attempted to do so. As the majority notes, a full seven hours passed between the time of defendant's arrest and the time of his blood sample. See *supra* ¶ 67. If officers had that much time in this case, where one victim was killed, another was severely injured, and various witnesses were present at the scene of the accident, I am puzzled by the majority's conclusion that section 11-501.2(c)(2) will amount to exigent circumstances in most cases. See *supra* ¶ 69.

¶ 125     If officers legitimately do not have time to obtain a warrant because a third party is injured, then exigency, not section 11-501.2(c)(2), would permit the warrantless blood draw. As the Court explained in *City of Los Angeles v. Patel*, 576 U.S. ___, 135 S. Ct. 2443 (2015), an "application" of the statute that does not implicate the statute cannot preserve its constitutionality. The Court specifically ruled that, "[i]f exigency or a warrant justifies an officer's search, the subject of the search must permit it to proceed irrespective of whether it is authorized by statute." *Id.* at ___, 135 S. Ct. at 2451. In other words, if the officer has a search warrant, then the warrant is what makes the search legal, not the statute. Similarly, if there is exigency, that is what justifies the search, not the statute. Thus, as *Patel* instructs, neither exigency nor a warrant serves as a valid application of section 11-501.2(c)(2) to preserve its constitutionality, and the statute does not otherwise provide a scenario where we can presume that officers will not have time to secure a warrant.

¶ 126     In sum, the United States Supreme Court has described compelled blood tests as "an invasion of bodily integrity [that] implicates an individual's 'most personal and deep-rooted expectations of privacy.' " *McNeely*, 569 U.S. at 148 (quoting *Winston*, 470 U.S. at 760). Section 11-501.2(c)(2), which obviates the warrant requirement whenever a third party is seriously injured or killed, intrudes on these deep-rooted expectations of privacy in a manner that is at odds with the fourth amendment. Therefore, I respectfully dissent from the portion of the opinion finding section 11-501.2(c)(2) facially constitutional.

¶ 127     JUSTICE NEVILLE took no part in the consideration or decision of this case.