2021 IL App (1st) 191437-U

No. 1-19-1437

Order filed March 10, 2021

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 6235 |
| | ) | |
| JOHN O'CONNOR, | ) | Honorable |
| | ) | Michele M. Pitman, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE BURKE delivered the judgment of the court.
Presiding Justice Howse and Justice McBride concurred in the judgment.

**ORDER**

¶ 1  *Held*: Defendant's convictions for reckless homicide, aggravated reckless driving, and leaving the scene of a motor vehicle accident involving personal injuries affirmed where the trial court properly denied defendant's motions for directed verdicts.

¶ 2  Following a jury trial, defendant John O'Connor was convicted of reckless homicide (720 ILCS 5/9-3(a) (West 2012)), two counts of aggravated reckless driving (625 ILCS 5/11-503(a)(1) (West 2012)) and leaving the scene of a motor vehicle accident involving personal injuries (625 ILCS 5/11-401(a) (West 2012)). Defendant was tried on one count of reckless homicide, two

counts of aggravated reckless driving, and one count of leaving the scene of a motor vehicle accident involving personal injuries. The trial court merged the aggravated reckless driving convictions and sentenced defendant to concurrent terms of three years' imprisonment for the three offenses. On appeal, defendant contends the trial court erred when it denied his motions for directed verdicts made after the State's case-in-chief, and renewed after defendant presented evidence, because the State failed to prove him guilty of the offenses beyond a reasonable doubt. We affirm.

¶ 3    At trial, Diane Helstern testified that about 1:45 p.m. on February 1, 2013, she and her husband, Robert, were driving southbound on Wentworth Avenue in their Chevrolet Malibu. It was a sunny day with blue skies. Robert was driving the speed limit as they drove south of River Oaks Drive. The area was a residential neighborhood with one lane of traffic in each direction and cars parked on the sides of the street. As Helstern looked further south on Wentworth, she observed a light-colored truck driving northbound towards them more than a block away. The truck was coming fast and did not appear to be slowing down. She said to Robert, "he's got to be doing 80 miles an hour and what's he going to do." There was a line of traffic heading in each direction. Another man was driving a vehicle northbound in the lane next to them. Helstern said to her husband, "it looks like that guy is going to try and come between the two lanes of traffic." Helstern saw the truck speeding but did not know where it went. She heard a loud crashing noise. The northbound vehicle that had been next to them spun around and struck the Helsterns' vehicle head-on. Their dashboard came towards them, their airbags deployed, and they could not move. Robert's legs were crushed, and he was screaming in pain. No other driver involved in the crash came to their vehicle.

¶ 4    Emergency personnel extricated the Helsterns from their vehicle and transported them to different hospitals. Diane had a broken neck, lacerated spleen, bruised ribs, and dislocated toes. She was hospitalized for three days. Robert underwent extensive rehabilitation and returned home in mid-April.

¶ 5    On cross-examination, Helstern clarified that there was traffic heading in both directions, but in the northbound lane, there were no vehicles between the one next to theirs and the oncoming truck. The truck "was speeding" and "came barreling" towards them. Helstern did not know if the truck was actually going 80 miles per hour. She testified, "[i]t was definitely speeding way beyond a residential area speed limit."

¶ 6    Alexander Czachura testified that about 1:45 p.m. on February 1, he and his wife, Jacquelen, were stopped at a red light at the intersection of Wentworth and River Oaks Drive. They were in the northbound lane of Wentworth. Traffic on River Oaks Drive had the green light and was flowing through the intersection. Alexander suddenly felt a big jolt as their vehicle was struck from behind. Their vehicle was pushed into the intersection and was struck by vehicles traveling on River Oaks Drive. Their vehicle spun around and came to a stop across the street facing south on Wentworth. Alexander was temporarily unconscious. His seat broke and he was laying on his back. The back of his head was bleeding. Emergency personnel extricated the Czachuras from their vehicle. Alexander had a fractured vertebra at the top of his neck, a strain in his right shoulder and arm, and received numerous stitches atop his head. He was hospitalized for three days.

¶ 7    Similar to Alexander, Jacquelen Czachura testified that they were stopped at a red light when their vehicle was struck from behind. She did not hear any noise prior to being struck. The rear of their vehicle was crushed into the back of their seats. Their vehicle spun and went through

the intersection. After their vehicle came to a stop, Jacquelen touched Alexander and her hand became covered with blood. She told Alexander he was bleeding, and he lost consciousness. Jacquelen intermittently lost consciousness. She felt tremendous pain through her chest area. Jacquelen was transported to Christ Hospital and placed in intensive care. All the bones in her back were broken and her sternum was cracked. After being hospitalized awhile, she underwent surgery during which 4 rods and 10 screws were permanently inserted to hold her back together. She remained in the hospital about a month following surgery. She was unable to walk. Jacquelen was transferred to a rehabilitation center where she received physical therapy for two months. When she returned home, she needed a hospital bed and was unable to get up on her own. Jacquelen is still in pain, unable to walk without assistance, and appeared in court in a wheelchair.

¶ 8 Sheata Mooyin testified that just before 2 p.m. on February 1, she was driving her Nissan Rogue westbound on River Oaks Drive. Her grandmother was with her. Mooyin had a green light as she drove through the intersection at Wentworth. Midway through the intersection she heard a loud "boom." Her vehicle was struck on the driver's side rear end. Her vehicle spun around and came to a stop still facing west in the middle of the intersection. Mooyin exited her vehicle. She observed the truck that struck her driving northbound on Wentworth "heading down the road."

¶ 9 On cross-examination, Mooyin testified that she did not hear any noise before she was struck and did not see the truck strike her vehicle. After her vehicle was struck, she observed a blue truck driving past her. She did not see the driver.

¶ 10 Calumet City police officer William Coffey testified that the intersection of Wentworth and River Oaks Drive is a commercial area with a few businesses and a forest preserve. When he arrived at the scene, Coffey observed three vehicles involved in an accident in the intersection. A

trail of debris and fluid led northbound on Wentworth from the intersection to a fourth vehicle, a Ford Explorer, that was stopped north of River Oaks Drive. The Explorer was facing northbound on Wentworth, one to two feet from the curb. Coffey approached the Explorer and observed defendant sitting upright in the driver's seat. Coffey identified defendant in court. Defendant was alone in his vehicle, which had front-end damage. Defendant did not appear to have any injuries and told Coffey he was okay. Coffey asked defendant what happened. Defendant did not recall any accidents occurring. Coffey looked south on Wentworth and observed another accident scene approximately two blocks south of the intersection in a residential area near 162nd Street. A sign indicated that the speed limit in the residential area on Wentworth was 35 miles per hour. On a satellite photograph depicting an overhead view of the area, Coffey indicated the two accident sites and the location where defendant's truck was stopped. A photograph taken from the intersection looking south on Wentworth depicted the accident in the residential area and the speed limit sign.

¶ 11     On cross-examination, Coffey confirmed that when he arrived at the intersection, he observed one accident, and looked down the street and observed another accident scene. He also confirmed that defendant was inside his vehicle at the scene. Defense counsel asked Coffey, "[a]nd it was one continuous scene right from that accident to the [*sic*] where the truck was at. Is that a clear shot?" Coffey replied, "[y]es." Coffey agreed that defendant appeared disoriented at the scene. Coffey did not smell alcohol on defendant. Defendant was transported to a hospital, and thereafter to the police station.

¶ 12     Calumet City firefighter/paramedic Christopher Pierce testified that he and his partner, Kirk Cahill, arrived at the accident scene near 162nd Street and Wentworth and observed a vehicle with heavy damage to the driver's side. They removed the driver, Nga Kok "Danny" Chin, and

placed him inside the ambulance. Chin was breathing and responded to painful stimuli but was unable to answer questions. He had two broken ankles and appeared to have a displaced left shoulder, a fractured right femur, fractures to both tibias with the bones revealed, and a laceration to his chin. His blood pressure was low, which indicated he was possibly bleeding out. His abdomen was bloated, which usually indicated fluid build-up. Chin was placed on advanced life support and transported to Christ Hospital. Chin became more alert on the way to the hospital and complained of severe back pain.

¶ 13    Dr. David McElmeel, a trauma surgeon at Christ Medical Center, testified that he treated Chin in the emergency room. Chin had multiple rib fractures, a collapsed lung, and fractures to both legs. Chin's blood pressure dropped, and he was taken into surgery. Chin had multiple lacerations to his liver and a retroperitoneal hematoma in the blood supply to his colon. Chin suffered significant internal blood loss which also caused his blood to not clot properly. Chin was placed in intensive care in critical condition. Chin's heart stopped, CPR was unsuccessful and he died. Chin's injuries were consistent with being caused by a motor vehicle collision.

¶ 14    The State presented a stipulation that Dr. Adrienne Segovia, an assistant medical examiner for Cook County, performed an external examination of Chin and reviewed his medical records from Christ. Segovia's opinion was that Chin's cause of death was multiple injuries due to a motor vehicle collision, and the manner of death was accident, meaning an unintended death.

¶ 15    South Chicago Heights police officer Rick Coulom, an operations commander with the Suburban Major Accident Reconstruction Team, testified as an expert in traffic reconstruction. Coulom investigated the February 1 crash on Wentworth. His investigation involved two different locations – the intersection of Wentworth and River Oaks Drive, and 1377 Wentworth. Coulom

first arrived at the intersection and was then informed that there was another crash site further south on Wentworth that involved serious injuries. Coulom went to the southern crash site and photographed and documented evidence including the locations of the vehicles, scrapes and gouges on the road, fluid spills, and debris. Such evidence indicated the location of the major part of the crash. He also inspected the vehicles and documented the damage. Coulom explained that the amount of "crush" to each vehicle gave him a sense of their speeds, directions, approaches, and departure angles.

¶ 16    Coulom observed two severely damaged vehicles stopped at their final locations in the southbound lane of Wentworth. One vehicle was Chin's Nissan Altima and the other was the Helsterns' Malibu. There was also a large area of debris. Based on the damage to Chin's Altima, Coulom knew the vehicle was involved in two crashes, a rear-end and head-on. The Malibu had very severe front-end damage indicating that it was involved in a front-to-front crash with the Altima. Coulom measured the scene using a Nikon Total Station, a surveilling laser-type instrument commonly used and relied upon for measuring distances for traffic crash reconstruction. He then created a scaled diagram of the after-crash scene from the collected data.

¶ 17    Using the diagram in court, Coulom pointed out a fluid path left by the Nissan after the first impact. Scrapes and gouges in the southbound lane of the road indicated the area where the two vehicles came together at their point of maximum engagement. Coulom's analysis revealed that Chin's Altima crossed over the center lane line into the southbound lane and collided with the Malibu. The damage to the vehicles indicated that they came together almost straight head-on, but off-centered just enough causing the vehicles to rotate away from the maximum point of engagement in different directions. Coulom used the gouges to determine the after-impact travel

distances of each vehicle, which enabled him to conduct a speed analysis. Coulom identified several photographs he took of the damaged vehicles and the crash site showing the field of debris, fluid spills, and scrapes and gouge marks left in the roadway by the collision.

¶ 18    Two license plates were found at this crash scene, one from the Altima and one from the Ford Explorer truck that was stopped on Wentworth north of the intersection. Coulom identified several photographs he took of the Explorer, some depicting front-end damage to the vehicle. The license plate for the Explorer was found in the northbound lane at the southern crash site. The Explorer had to make contact with the Altima for its license plate to fall off. Given the location of the Explorer's license plate, the front-end damage to the Explorer, and the damage indicating a rear impact to Chin's Altima, Coulom determined that the Explorer struck the Altima from behind and caused it to rotate and go into the southbound lane where it collided with the Malibu.

¶ 19    Coulom explained that, based on the final resting spots of the Altima and Malibu, he worked backwards and used a formula to calculate the speeds of the vehicles at the time of the crash. Using his scaled diagram, Coulom plotted the distance of the after-travel impact of each vehicle. Coulom entered that distance together with the "drag factor" of the roadway and the weight of each vehicle into a colinear formula. Coulom explained "colinear" meant that the vehicles were in line in a head-on or rear-end collision. Coulom determined that the speed of the Altima at the time of impact with the Malibu was 48 miles per hour.

¶ 20    Using the same formula, but as a rear-end crash, Coulom determined the speed of the Explorer at the time it crashed into the Altima. The Explorer had over-ridden the rear bumper of the Altima and came into its trunk. The vehicles had stayed together for some distance to cause the amount of damage done. Based on the ground evidence, debris, and damage to both vehicles,

Coulom determined that after the Explorer struck the Altima, the vehicles remained in contact for about 21 feet. The Altima then separated and entered the southbound lane of traffic and the Explorer continued traveling northbound. Coulom used the previously calculated impact speed of the Altima of 48 miles per hour as the after-impact speed of both the Altima and Explorer following their collision. By entering that speed and the weight of the Explorer into the formula, Coulom determined that the Explorer was traveling about 58 miles per hour when it struck the Altima. The Explorer was exceeding the speed limit, which was 35 miles per hour in the residential area.

¶ 21    Coulom observed a trail of fluid leading from the initial crash site to the second crash at the intersection of Wentworth and River Oaks Drive. Coulom photographed and documented the second crash site and created an after-crash diagram of the scene. In court, Coulom identified several photographs of the damaged vehicles and crash site. Coulom determined that, following the first crash, the Explorer continued traveling northbound on Wentworth. The Explorer rear-ended another Chevrolet Malibu that was stopped for a red light at the intersection. The Explorer pushed the Malibu into the intersection, causing the Malibu to strike a white Nissan Rogue that was traveling westbound on River Oaks Drive. The Malibu and Rogue then struck a black Toyota that was parked or about to park on Wentworth. Coulom's determination was based on the location of the damage and impact areas, scratch marks and gouge marks on the roadway, and fluid trails.

¶ 22    The Explorer continued traveling northbound on Wentworth leaving a large fluid spill. Referring to his diagram, Coulom pointed out that the Explorer stopped "[a]ll the way up here" approximately 350 to 400 feet north of the intersection. Based upon his assessment of the physical condition of the Explorer and the fluid loss, Coulom opined that the fluid loss "eventually made the vehicle come to a stop because it was running out of its fluid needed to travel any further." He

testified, "the Ford continued on until it finally just quit running." Coulom did not perform an operational test of defendant's vehicle.

¶ 23    Using the colinear formula, Coulom calculated the speed of defendant's Explorer when it rear-ended the Czachuras' Malibu at the intersection. He first determined the after-impact speed of both vehicles, which were stuck together as the Explorer pushed the Malibu into the intersection. Coulom used the drive factor weight and the distance the vehicles slid to calculate the after-impact speed. He then worked backwards to the point of first contact to determine the Explorer's speed when it struck the Malibu. Coulom concluded that the speed of the Explorer at the time of impact was in the range of 38 to 49 miles per hour.

¶ 24    Coulom noted that when the Explorer struck Chin's Altima, the Altima's license plate was lodged in the Explorer. When the Explorer struck the Malibu at the intersection, the Altima's license plate fell off the front of the Explorer, leaving it in the debris at the second crash site. That evidence alone indicated to Coulom that the Explorer caused both crashes.

¶ 25    Coulom did not observe any pre-impact tire marks, which indicated that if defendant was braking, he did not brake hard enough to cause his tires to skid on the road surface to leave any marks. It did not mean that defendant was not braking.

¶ 26    On cross-examination, Coulom agreed that the speed of the Explorer decreased between the first and second crash sites. Coulom further agreed that when defendant was driving 58 miles per hour, he was driving 23 miles over the speed limit. Coulom confirmed that he determined that defendant was the "sole and proximate cause of the crash." Coulom acknowledged that there was damage to the driver's side of defendant's Explorer in front of the rear wheel. Coulom used the colinear formula to determine the speeds of the vehicles because that is the only formula used for

in-line head-on and rear-end collisions, which was what occurred in this case. In using the colinear formula, Coulom assumed that Chin was driving 35 miles per hour when he was rear-ended by the Explorer. Coulom testified that defendant left the scene of the first crash. He stated, "I don't know if you want to say fled, but he did not remain at the first scene. He continued northbound until he got into another crash at the intersection." Coulom acknowledged that nothing intervened between the two crashes and defendant did not turn off Wentworth. Defense counsel asked Coulom, "[t]his is one continuous accident in other words?" Coulom replied, "[t]here was some time in between the first crash and the second crash." Coulom acknowledged it was a matter of seconds between the two crashes.

¶ 27    On redirect examination, Coulom testified that he analyzed the damage to the driver's side of defendant's Explorer and believed it was caused by secondary contact following the initial contact with either vehicle that was rear-ended by the Explorer. As the vehicles rotated away from the Explorer during separation, they may have made additional contact with the Explorer. Because both the Altima and the Czachuras' Malibu had rear-end damage, Coulom could not definitively identify which crash the damage occurred in or which vehicle caused the damage to the Explorer. Coulom did not measure the distance between the two crash sites. Coulom identified a photograph he took while standing in the middle of the intersection and looking south down Wentworth, and pointed out the location of the initial crash site down the street. Coulom explained that the colinear formula required him to assume the speed of the Altima unless he had definitive proof of the vehicle's speed from eyewitness testimony, driver testimony, or an event data recorder in the vehicle. Coulom did not have any such evidence, and thus, without any conflicting evidence, he had to assume Chin was driving the speed limit of 35 miles per hour.

¶ 28    Following the State's case, defendant moved for a directed verdict arguing the State failed to show he was driving recklessly. Counsel argued 23 miles over the speed limit is not considered excessive speed. Counsel further argued that speed alone is not sufficient to establish recklessness, and the State failed to present other evidence showing defendant's conscious disregard of a substantial risk that could cause death or great bodily harm to others, and that a reasonable person would have acted differently under the same circumstances. In addition, counsel argued the State failed to prove defendant left the scene where the evidence showed the two accidents comprised one continuous scene, and defendant was stopped and sitting in his vehicle at the scene and provided police with the necessary information.

¶ 29    In addition to speed, the evidence showed defendant failed to reduce his speed. The State argued that Helstern's testimony that defendant appeared as if he was going to drive between the lanes of traffic implied that he crossed the center line. The State further argued that the controlling factors here were the conditions, including the residential area, traffic heading in both directions, and cars parked along the curb. The State urged the court to consider that defendant's acts after the first crash resulted in the second crash. The State pointed out that the charge for leaving the scene was regarding the first crash involving Helstern. The State argued that defendant did not stay in that location following the crash but continued driving. It noted Coulom's testimony that defendant's vehicle stopped due to fluid loss, and argued defendant did not remain at the scene by his own actions.

¶ 30    In reply, defense counsel argued that Helstern "backtracked" on her testimony regarding defendant's speed. Counsel further argued that Coulom's testimony that defendant's vehicle ran out of fluid should be disregarded. Counsel asserted that the incident was one scene and that

defendant remained there and cooperated. After considering the evidence in the light most favorable to the State, the trial court denied defendant's motion for a directed verdict.

¶ 31    Defendant testified that on February 1 he left his house on Wentworth about 1 or 1:30 p.m. and drove north on Wentworth. He observed a black 2011 Hyundai Elantra driving eastbound on 162nd Street disregard a stop sign. The Elantra ran into the side of defendant's truck and caused him to lose control of his vehicle. Although defendant was wearing his seatbelt, the impact threw him out of his seat. Defendant's head landed on the passenger's side floorboard. Defendant's vehicle had bucket seats and a center console, and thus, he could not reach the brake pedal. He grabbed his gear shift and pulled it down into low gear hoping to reduce his speed. He pulled himself up with his steering wheel. As soon as he got himself up, defendant heard a "boom," and was again thrown out of his seat and onto the floor. Defendant returned to his driver's seat. His motor stalled at Wentworth and River Oaks Drive. Defendant stepped on his brake as hard as he could and pulled the steering wheel towards him to stop his vehicle. He was about 400 feet north of River Oaks Drive. Defendant exited his vehicle and called 911. The police arrived 20 minutes later. An officer asked defendant if he needed medical assistance, and defendant declined. Defendant went to the hospital, and from there went to the police station.

¶ 32    Defendant confirmed that he was on the scene when the police and ambulance arrived. As he began to approach the Elantra, the vehicle started. The female driver drove south in the northbound lane of Wentworth and turned on 163rd Street. Defendant did not know where the woman went after that because he wanted to remain at the accident site and did not want to be charged with leaving the scene.

¶ 33    On cross-examination, defendant testified that when he exited his vehicle, he walked back to the intersection of Wentworth and River Oaks Drive. He then observed the Elantra stalled in the middle of Wentworth at 162nd Street with one tire at a 45-degree angle and its fender up in the air. The female driver started the Elantra and drove south in the northbound lane of Wentworth and turned east onto 163rd Street. The Elantra drove around Chin's vehicle which was sitting in the southbound lane. A female officer was the first officer who approached defendant at the scene. Defendant told her that his vehicle was struck by the Elantra. Defendant denied that he was involved in the crash with the Altima. He drove through that area without incident. The Elantra sideswiped him with such force that it propelled him out of his seat and headfirst into the passenger's floorboard area. Defendant's foot was not on the gas pedal from 162nd Street to River Oaks Drive, but his vehicle continued traveling straight northbound on Wentworth on its own and struck the Czachuras' vehicle with such force that it propelled their vehicle into the intersection. Defendant assumed he was at the intersection of Wentworth and River Oaks Drive when he heard the boom. Defendant was driving 35 miles per hour when the Elantra struck him. When the Elantra was less than three feet from his window, defendant observed the driver texting on her cell phone. Defendant acknowledged that a more effective way to stop his vehicle would have been to push his gear shift into park but claimed that would have "destroyed" his transmission. Defendant was "a little dazed" but not injured when he was thrown from his seat.

¶ 34    Following his testimony, defendant rested his case and renewed his motion for a directed verdict without further argument. The trial court again found that, considering the evidence in the light most favorable to the State, there was enough evidence to present the case to the jury to

determine whether defendant was guilty or not guilty. The court therefore denied defendant's renewed motion.

¶ 35    In rebuttal, Calumet City police officer Larissa Chavez testified that on February 1 she arrived at the crash scene at Wentworth and River Oaks Drive about 2:14 p.m. and exited her vehicle. She approached defendant's vehicle, which was stopped north of River Oaks Drive. Defendant was alone inside his vehicle. Chavez identified defendant in court. Chavez asked defendant for his driver's license and insurance information. She did not recall if he provided those documents. Defendant did not tell Chavez that his vehicle was struck by another vehicle while he was driving northbound on Wentworth.

¶ 36    On cross-examination, Chavez testified that she had a very limited discussion with defendant. She recalled approaching defendant, asking him if he was okay, and asking for his license and insurance. Chavez asked defendant about the accident but did not recall his response. Defendant did not tell her that a vehicle struck his near 162nd Street.

¶ 37    The jury found defendant guilty of reckless homicide, two counts of aggravated reckless driving causing great bodily harm to Diane Helstern and Jacquelen Czachura, and one count of leaving the scene of a motor vehicle accident involving personal injury to Diane Helstern.

¶ 38    Defendant filed a motion for a new trial alleging, *inter alia*, that the trial court erred when it denied his motions for directed verdicts made after the State's case-in-chief and after defendant presented evidence. The court denied defendant's posttrial motion.

¶ 39    At sentencing, the trial court stated, "defendant clearly acted recklessly on this day." The court also noted that defendant did not stop to render aid to any of the injured people knowing that he had struck their vehicle and that the force of the collision had to have caused injuries. The court

merged the two counts of aggravated reckless driving and sentenced defendant to concurrent terms of three years' imprisonment for reckless homicide, aggravated reckless driving, and leaving the scene of a motor vehicle accident involving personal injuries.

¶ 40 On appeal, defendant contends the trial court erred when it denied his motions for directed verdicts made after the State's case-in-chief, and renewed after defendant presented evidence, because the State failed to prove him guilty of the offenses beyond a reasonable doubt. Defendant argues that the State failed to prove he acted recklessly because it failed to show he was driving at an excessive speed and failed to present other evidence in addition to speed to show he acted with a conscious disregard of the substantial risk that his acts were likely to cause death or great bodily harm. Defendant asserts that Coulom's analysis and estimations of his speed were flawed and unreliable because they were based on assumptions that had no evidentiary basis. Defendant also claims Coulom's use of a colinear formular was erroneous because the collision with Chin's vehicle was angular rather than colinear. Defendant argues that driving 23 miles per hour over the speed limit is a petty offense, and thus, does not constitute excessive speed. He also argues that, although Helstern estimated defendant was driving 80 miles per hour, she later acknowledged she did not know how fast he was driving. Defendant further asserts that, other than his speed, the State presented no evidence that he committed other traffic violations or willfully disregarded his surroundings and circumstances. He claims his testimony provided a plausible alternative explanation for what occurred, and his conduct was nothing more than negligent. In addition, defendant contends the State's evidence failed to prove he left the scene of the accident, but instead, showed he remained at, or in close proximity to, the accident scene and provided police with his required information.

¶ 41    As a threshold matter, we find it necessary to clarify the issue on appeal. Defendant is adamant that the jury's assessment of the evidence and findings are not relevant to this appeal. Hence, he is not challenging the jury's guilty verdict. Defendant's issue is that the trial court erred when it denied his motions for directed verdicts made after the State's case-in-chief and renewed after defendant presented his case. Accordingly, he is arguing that the State failed to present sufficient evidence that could support a guilty verdict.

¶ 42    Section 115-4(k) of the Code of Criminal Procedure provides the standard for the trial court to grant a motion for a directed verdict:

> "When, at the close of the State's evidence or at the close of all of the evidence, the evidence is insufficient to support a finding or verdict of guilty the court may and on motion of the defendant shall make a finding or direct the jury to return a verdict of not guilty, enter a judgment of acquittal and discharge the defendant." 725 ILCS 5/115-4(k) (West 2018).

¶ 43    A motion for a directed verdict asserts only that, as a matter of law, the evidence is insufficient to support a guilty verdict. *People v. Withers*, 87 Ill. 2d 224, 230 (1981). The motion requires the trial court to determine only whether a reasonable mind could fairly conclude the defendant is guilty beyond a reasonable doubt, considering the evidence most strongly in the State's favor. *Id.* When a defendant moves for a directed verdict, for purposes of the motion he admits the truth of the facts presented in the State's evidence. *People v. Aljohani*, 2020 IL App (1st) 190692, ¶ 78.

¶ 44    "Whether evidence *could support* a particular finding or verdict (the inquiry upon a motion for directed verdict) is a different question from whether the evidence *does in fact support* that

finding or verdict after a full evidentiary hearing." (Emphasis in original.) *People v. Urdiales*, 225 Ill. 2d 354, 430 (2007). "In the latter instance, the trier of fact necessarily weighs *all* the evidence and passes upon the credibility of witnesses in resolving disputed issues." (Emphasis in original.) *Id.* In contrast, when deciding whether the evidence is sufficient to withstand a motion for a directed verdict, the trial court does not weigh the evidence or determine the credibility of the witnesses. *People v. Williams*, 2017 IL App (1st) 152021, ¶ 26 (citing *People v. Connolly*, 322 Ill. App. 3d 905, 915 (2001)). A motion for a directed verdict presents a question of law, and thus, we review the trial court's ruling on the motion *de novo*. *Aljohani*, 2020 IL App (1st) 190692, ¶ 78.

¶ 45    To prove defendant guilty of reckless homicide the State had to show that, while driving a motor vehicle, he unintentionally and without lawful justification recklessly performed acts that were likely to cause death or great bodily harm to a person, and those acts, specifically, exceeding the posted speed limit and failing to reduce speed to avoid an accident, caused Chin's death. 720 ILCS 5/9-3(a) (West 2012). To prove defendant guilty of the two counts of aggravated reckless driving, the State had to show that he drove a motor vehicle with a willful or wanton disregard for the safety of persons, which resulted in great bodily harm to Diane Helstern and Jacquelen Czachura. 625 ILCS 5/11-503(a)(1) (West 2012). To prove defendant guilty of leaving the scene of a motor vehicle accident involving personal injuries, the State had to show that he was the driver of a vehicle involved in a motor vehicle accident that resulted in personal injuries to Diane Helstern, that he knowingly failed to immediately stop his vehicle at the scene of the accident or as close thereto as possible, and that he failed to remain at the scene of the accident until the requirements of section 11-403 were fulfilled, which include providing his name, address, and

registration information and rendering reasonable assistance to any injured person. 625 ILCS 5/11-401(a) (West 2012).

¶ 46    Defendant first contends the trial court erred when it denied his motions for directed verdicts for the offenses of reckless homicide and aggravated reckless driving because the State did not provide sufficient evidence to allow the jury to find that he was driving recklessly. The Illinois Criminal Code defines recklessness:

> "A person is reckless or acts recklessly when that person consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense, and that disregard constitutes a gross deviation from the standard of care that a reasonable person would exercise in the situation. An act performed recklessly is performed wantonly, within the meaning of a statute using the term "wantonly", unless the statute clearly requires another meaning." 720 ILCS 5/4-6 (West 2012).

Generally, a defendant acts recklessly when he is aware his conduct may result in death or great bodily harm, although it is not substantially certain that result will occur. *People v. Eubanks*, 2019 IL 123525, ¶ 74. Reckless conduct usually involves a lesser degree of risk than conduct which creates a strong probability of death or great bodily harm. *Id.* A defendant's mental state, including whether he acted recklessly, often needs to be inferred from circumstantial evidence and the surrounding circumstances, which is a task "particularly suited to the jury." *Id.* ¶¶ 74, 77, 80.

¶ 47    Although evidence of excessive speed alone is not sufficient to sustain a conviction for reckless homicide, excessive speed combined with other circumstances which indicate a conscious disregard of a substantial risk likely to cause death or great bodily harm to others such that a

reasonable person would have acted differently under the same circumstances is sufficient. *People v. Barham*, 337 Ill. App. 3d 1121, 1130 (2003) (citing *People v. Potter*, 5 Ill. 2d 365, 371 (1955), *People v. Jakupcak*, 275 Ill. App. 3d 830, 838 (1995)). "In finding the evidence sufficient to support a reckless homicide conviction, courts have focused on such factors as driving while intoxicated, driving at an excessive speed, disobeying traffic signals or lane markings, and fleeing the scene of the accident." *Eubanks*, 2019 IL 123525, ¶ 78 (citing nine cases with parentheticals therein). "When there is *excessive* speed on the part of a defendant in a non-emergency situation that causes the death of another person, it is unlikely there would not be other circumstances sufficient to show that the defendant consciously disregarded a substantial and unjustifiable risk, and that such disregard was a gross deviation from the standard of care which a reasonable person would have exercised in the same situation." (Emphasis in original.) *People v. Mancinelli*, 232 Ill. App. 3d 211, 218 (1992).

¶ 48    Here, viewed most strongly in the State's favor, and taking the facts in the State's evidence as true, we find that the State presented sufficient evidence in its case-in-chief from which the jury could fairly conclude that defendant was guilty beyond a reasonable doubt of reckless homicide and aggravated reckless driving. For the reckless homicide offense, the charge alleged defendant exceeded the posted speed limit and failed to reduce his speed to avoid the accident that resulted in Chin's death. For the aggravated reckless driving charges, the State had to show defendant was driving with a willful or wanton disregard for the safety of others. Helstern testified that she observed defendant's truck driving very fast and it did not appear to be slowing down. They were driving in a residential area on Wentworth at 1:45 p.m., and there was traffic heading north and south on the two-lane street. Helstern estimated that defendant's vehicle appeared to be going 80

miles per hour. She later acknowledged she did not know if he was actually going 80, but maintained that the vehicle "came barreling" towards them and "was definitely speeding way beyond a residential area speed limit." Coffey testified that the speed limit in the residential area on Wentworth was 35 miles per hour, and a speed limit sign was posted. Coulom, an expert in traffic reconstruction, testified that he conducted a speed analysis and determined that defendant was driving about 58 miles per hour, exceeding the speed limit in the residential area, when defendant's truck struck the rear of Chin's Altima. Coulom further concluded that defendant was driving in the range of 38 to 49 miles per hour when his vehicle struck the rear of the Czachuras' Malibu, which was stopped at the stoplight. Taking this testimony as true, the record shows that the State's evidence was sufficient for the trial court to find that the jury could fairly conclude that defendant was driving at an excessive speed.

¶ 49    The record further reveals that, in addition to excessive speed, the State presented other evidence which, when coupled with the speed, could allow the jury to conclude defendant was driving recklessly. The evidence showed that defendant was speeding 23 miles per hour over the limit at 1:45 p.m. on a residential street. Defendant's truck did not appear to be slowing down as it approached Chin's Altima. At the time, Helstern said to her husband, "it looks like that guy is going to try and come between the two lanes of traffic." Defendant's vehicle struck Chin's vehicle with such force that it pushed Chin's Altima over the center lane line and into the southbound lane where Chin's vehicle struck the Helsterns' Malibu head-on, resulting in Chin's death and severe injuries to the Helsterns. Defendant did not stop his vehicle, but instead, continued speeding northbound on Wentworth for another two blocks. As defendant approached the intersection with River Oaks Drive, he did not stop for the red light. He crashed into the rear of the Czachuras'

stopped vehicle with such force that he pushed their vehicle into traffic in the middle of the intersection where it struck Mooyin's vehicle traveling westbound on River Oaks Drive. Defendant did not stop at the intersection. He drove through the red light and continued driving northbound on Wentworth until his vehicle came to a stop 350 to 400 feet north of the intersection. Coulom testified that defendant's vehicle came to a stop at that location because "it was running out of its fluid needed to travel any further." He further opined, "the Ford continued on until it finally just quit running." Taking this evidence as true, the jury could find that, in addition to speeding, defendant failed to reduce his speed to avoid two accidents, crashed into the rear of two vehicles at two locations, continued driving without stopping at the crash scenes, disobeyed a red light, and did not stop driving until his vehicle became disabled. Accordingly, the State presented sufficient evidence for the jury to fairly conclude that defendant was driving recklessly.

¶ 50 The record thereby shows that the trial court could determine that the State presented sufficient evidence for a reasonable person to conclude that defendant was guilty beyond a reasonable doubt of reckless homicide and aggravated reckless driving. *Withers*, 87 Ill. 2d at 230. We therefore find that the trial court's denial of defendant's motions for directed verdicts as to these two offenses was proper.

¶ 51 In reaching this conclusion, we find defendant's challenges to the credibility of Helstern's testimony and the reliability of Coulom's analysis and testimony unpersuasive. When considering a motion for a directed verdict, the State's evidence is taken as true and the trial court does not determine the credibility of the witnesses. *Williams*, 2017 IL App (1st) 152021, ¶ 26. In addition, defendant's assertions that driving 23 miles over the speed limit does not constitute excessive speed and that his conduct was nothing more than negligent are similarly unpersuasive. The trial

court does not weigh the evidence or make factual determinations when ruling on a motion for a directed verdict. *Id.* The jury is responsible for making factual determinations and determining the defendant's mental state, including whether he acted recklessly or negligently. *Eubanks*, 2019 IL 123525, ¶¶ 74, 77, 80. Defendant is not challenging the jury's verdict in this appeal.

¶ 52     Defendant also contends the trial court erred when it denied his motions for a directed verdict for the offense of leaving the scene of a motor vehicle accident involving personal injuries to Diane Helstern. Defendant claims the State's evidence failed to show he left, or remained close to, the scene. Defendant claims there was one accident scene, and the incident was one continuous series of accidents, not two separate accident scenes.

¶ 53     Defendant's argument is without merit. The charge specified the offense was for leaving the scene of the accident involving injuries to Helstern. That was the first crash site where defendant struck Chin's Altima. The statute provides that the driver of a vehicle involved in an accident with injuries "shall *immediately* stop such vehicle at the scene of such accident." (Emphasis added.) 625 ILCS 5/11-401(a) (West 2012). Here, both Coffey and Coulom testified that there were two crash sites on Wentworth. Coulom further testified that defendant left the scene of the first crash. He stated, "I don't know if you want to say fled, but he did not remain at the first scene. He continued northbound until he got into another crash at the intersection." Taking the State's evidence as true, a reasonable mind could fairly conclude that defendant did not "immediately" stop his vehicle and remain at the crash site after he struck Chin, and hence, that he was guilty beyond a reasonable doubt of leaving the scene of the accident. *Withers*, 87 Ill. 2d at 230. Whether the evidence ultimately established that there were one or two crash sites was a determination for the jury to make after weighing the evidence and determining the credibility of

the witnesses. *Urdiales*, 225 Ill. 2d at 430. Defendant is not challenging the jury's verdict. Based on this record, we find that the trial court properly denied defendant's motions for a directed verdict for the offense of leaving the scene of the accident.

¶ 54 For these reasons, we affirm the judgment of the circuit court of Cook County.

¶ 55 Affirmed.